UNITED STATES of America, Plaintiff-Appellee,

v.

Virgil Paul WOMACK, Defendant-Appellant.

No. 75–2829.

United States Court of Appeals, Ninth Circuit.

June 30, 1976.

Daniel Markoff, Asst. Public Defender (argued), Las Vegas, Nev., for defendant-appellant.

Samuel Coon, Asst. U. S. Atty. (argued), Reno, Nev., for plaintiff-appellee.

Before ELY and GOODWIN, Circuit Judges, and PECKHAM,* District Judge.

PECKHAM, District Judge:

Appellant Virgil Paul Womack and code-fendant Jack Walton Taylor were charged by indictment with kidnapping, conspiracy and aiding and abetting in violation of 18 U.S.C. §§ 1201(a), 1201(a)(1) and (2). Appellant, who was tried alone, was convicted after a jury trial.

Appellant met Taylor in Boise, Idaho, on January 7, 1975. Taylor boasted to appellant that he had committed a successful bank robbery and was on his way to Florida to collect the money; he invited appellant to accompany him on his journey south. Appellant allegedly did not believe Taylor's story, but decided to hitchhike to Florida with him. The day following their meeting, the pair started hitchhiking towards Washington state, where Womack planned to obtain a loan from a relative. They arrived in Ontario, Oregon, where they accepted a ride from the victim, Merrill Abrahams, a cattle buyer from Ontario, who was on a business trip to Idaho.

After Abrahams had picked up appellant and Taylor, Taylor held him at gunpoint and allegedly ordered appellant to drive the car. Throughout the ensuing episodes, Taylor was always armed and appellant was never armed; the defense theory was that appellant was as much a victim of Taylor's coercion as Abrahams.

When the trio arrived at Wells, Nevada, Taylor ordered Abrahams to exit from the car. While Abrahams was walking away from the vehicle, Taylor shot and killed him. The car proceeded to Arizona.

In Arizona, Taylor attempted to purchase clothing by using a credit card lifted from Abrahams. When Taylor misspelled Abra-

---

* Honorable Robert F. Peckham, United States District Judge for the Northern District of California, sitting by designation.

hams' name a salesclerk grew suspicious and, after several telephone calls, ascertained that Taylor was not Abrahams. Appellant and Taylor fled, but were sighted and stopped by Flagstaff police within minutes.

## ISSUES PRESENTED

1. Did the trial court err in refusing to suppress appellant's incriminating statements?

2. Did the trial court err in refusing to permit appellant to subpoena Taylor to testify at appellant's trial?

3. Did prosecutorial misconduct impede the defense from adequately preparing its case?

1. The Trial Court's Denial of Appellant's Motion to Suppress His Custodial Statements

Appellant contends that the state's failure to honor his requests for appointed counsel rendered his subsequent incriminating statements inadmissible at trial. We agree.

The sequence of events leading to appellant's custodial incriminating remarks is undisputed. Immediately upon his arrest on January 10, 1975, after hearing the *Miranda* warnings, appellant requested assistance of an attorney. That afternoon, appellant and Taylor were transported to jail for booking; at that time, appellant again requested appointed counsel. Police Officer Martinez advised appellant that "it would be taken care of," but took no steps to contact a lawyer.

The following morning, January 11, 1975, Captain Tubbs of the Winslow Police Department visited appellant at his cell and administered the *Miranda* warnings a second time. On this occasion, appellant did not renew his request for counsel, allegedly because he was "scared" and because "every time I asked for one I never got one, so I gave up on the fact." Appellant proceeded to make incriminating statements to Captain Tubbs, who did not secure a written waiver of rights from appellant.

Several hours after the interview with Captain Tubbs, Chief Maule of the Winslow Police Department contacted appellant. At this time, Chief Maule provided a written waiver of rights form, which appellant signed. Appellant then made a second incriminating statement to the authorities.

Appellant contends that the state, creating a threatening incommunicado atmosphere, violated his rights by obtaining a statement from him after twice ignoring his requests for counsel. Appellee points out that while appellant was twice denied counsel on January 10, 1975, he was subjected to no interrogation on that date. Appellant was not questioned until the following day, when appellant was again issued *Miranda* warnings and failed to renew his request for an attorney; accordingly, claims the government, appellant changed his mind and voluntarily issued a statement to the police. Appellant denies that he voluntarily reversed his prior decision to consult an attorney, and claims that the state's repeated refusal to honor his requests created a sense of futility and rendered meaningless the recital of *Miranda* warnings.

*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), counsels that the government must immediately honor any request for an attorney or refrain from further questioning until a lawyer is secured:

If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and indicates that he wants one before speaking to police, they must respect his decision to remain silent. This does not mean, as some have suggested, that each police station must have a 'station house lawyer' present at all times to advise prisoners. It does mean, however, that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and if

he cannot afford one, a lawyer will be provided for him prior to any interrogation. If authorities conclude they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time.

384 U.S. at 474, 86 S.Ct. at 1628.

The Supreme Court has not retreated from this principle in the ten-year period since *Miranda* was decided. In the most recent opinion clarifying *Miranda* procedures, *Michigan v. Moseley*, 423 U.S. 96 (1975), the Court held constitutionally permissible a renewed interrogation on an independent offense (homicide) after the accused had indicated his desire to remain silent on another suspected crime (burglary). The Court specifically distinguished that situation from a case of renewed custodial questioning after a request for counsel; citing the passage quoted above, the Court reaffirmed the rule that interrogation must cease until an attorney is present.

In numerous cases, lower courts have condemned the procedure followed in the present case and have held inadmissible any statement obtained by the government after failing to honor a request for counsel. *United States v. Clark*, 499 F.2d 802 (4th Cir. 1974); *United States v. Blair*, 470 F.2d 331 (5th Cir. 1972); *United States v. Priest*, 409 F.2d 491 (5th Cir. 1969); *United States v. Cookston*, 379 F.Supp. 487 (W.D.Tex. 1974); *United States v. Blocker*, 354 F.Supp. 1195 (D.D.C.1973).[1] In a case closely analogous to the present situation, the California Supreme Court recently held unconstitutional a confession obtained after an accused indicated a desire to consult an attorney. *People v. Superior Court*, 15 Cal.3d 729, 125 Cal.Rptr. 798, 542 P.2d 1390 (1975). In that case, during custodial interrogation of two defendants, one defendant stated to his codefendant, "Do we need a lawyer?" and requested the interrogating officers to suggest an attorney. Declining to recommend counsel, the officers left the suspects with a telephone and telephone book. Upon their reentry into the room ten minutes later, officers renewed questioning; during this interview, one defendant made incriminating remarks. A unanimous Supreme Court held that the accused's question—"do we need a lawyer?"—constituted a "specific and pointed desire to consult counsel" which prohibited any further questioning; the statements were therefore held inadmissible. Appellant in the present case, who on two occasions expressly requested assistance of appointed counsel from state officers, made a clearer and stronger invocation of his right to counsel than the suspects in *People v. Superior Court*; nevertheless, the government renewed interrogation.

■ The government urges, however, that appellant's custodial statements on January 11, 1975, were freely volunteered; appellee claims, in short, that before speaking appellant reversed his prior decision to consult an attorney before interrogation. We recognize that an accused may waive a previously-invoked right to counsel. *United States v. Jackson, supra.* Where the government asserts waiver, however, it bears a heavy burden of proving its claim. *Miranda v. Arizona, supra.* This burden is not discharged by the mere fact that statements were eventually obtained from an accused. *United States v. Blair*, 470 F.2d

---

1. *United States v. Jackson*, 436 F.2d 39 (9th Cir. 1970), on which appellee relies, is clearly distinguishable. Upon arrest, defendant in *Jackson* stated to the authorities that "he had some things to say [indicating a desire to make a statement] but would like to talk to his lawyer before saying anything." The authorities advised him of his right to appointed counsel, which defendant did not accept. The government fully honored defendant's request for additional time before renewed interrogation; no one contacted defendant until four days later, when defendant, after signing a waiver of rights form, issued a statement. Here, in contrast, appellant, who was unable to secure his own attorney, specifically requested appointment of counsel on two occasions; the police ignored the requests and questioned appellant the following morning; and appellant's statement was obtained prior to securing any written waiver of rights form.

331 (5th Cir. 1972). Nor may the government establish waiver by the mere repetition of *Miranda* warnings. *United States v. Cookston,* 379 F.Supp. 487, 489–490 (W.D. Tex.1974); *United States ex rel. Chabonian v. Liek,* 366 F.Supp. 72 (E.D.Wis.1973).

In the present case, the record is barren of evidence from which we could conclude that appellant made a knowing and intelligent waiver of his right to counsel. At the hearing on appellant's motion to suppress, appellant testified that he spoke to Captain Tubbs not because he no longer desired counsel but because he did not believe that an attorney would ever be appointed:

Q. You did not ask for an attorney on that occasion? [Saturday, January 11, 1975]

A No, sir.

Q. Why not?

A. Because every time I asked for one, I never got one, so I gave up on the fact.

Tr. 116:14–18.

Appellant's testimony was uncontradicted by the interrogating officer, Robert Tubbs, who stated at the suppression hearing that he was unaware of appellant's two prior requests for counsel, and further stated that if he had known of the requests, he would not have interrogated appellant. Upon questioning by the government attorney, Officer Tubbs testified that he would interrogate a suspect who, having requested counsel, had unequivocally declared that he had changed his mind. In such a case, however, Officer Tubbs stated that he would secure from the suspect a written waiver of rights form; he did not attempt to obtain such written consent in the present case.

The government stresses that prior to speaking with Chief Maule, appellant did sign a written waiver of rights form. This event, however, occurred after appellant had already spoken with Captain Tubbs; thus, the sense of futility created by the state's ignoring appellant's requests for assistance of counsel could only have been exacerbated by appellant's having already told his story to governmental authorities.

Appellant testified as to his state of mind in signing the waiver form:

Q. Did you realize [when you signed the waiver form] that you were waiving your right to have an attorney present by doing that?

A. Well, it seemed I didn't think about that, because I thought I might not get one anyway.

Q. What made you think that?

A. Because I was never appointed one before all the times I asked for one.

Tr. 118:8–14.

On this record, we cannot conclude that appellant made a knowing, intelligent and voluntary waiver of his twice-invoked right to appointed counsel. Accordingly, we hold that appellant's incriminating custodial statements were obtained in violation of his Fifth and Sixth Amendment rights, and that their subsequent admission in the government's case-in-chief was prejudicial error.

2. The Trial Court's Refusal to Permit Appellant to Subpoena Taylor

On May 13, after an evidentiary hearing, the trial court found appellant's codefendant Taylor incompetent to stand trial. Considering that Taylor lacked the requisite mental competence to waive his Fifth Amendment privilege against self-incrimination, the trial court on June 26, 1975, refused to permit appellant to subpoena Taylor as a witness at his trial. The court did, however, allow introduction at appellant's trial of certain custodial statements made by Taylor which tended to exculpate appellant.

The trial court's denial of appellant's request to subpoena a critical witness presents difficult issues. While Taylor was adjudged incompetent to stand trial on May 13, 1975, this finding would not necessarily mean that Taylor would be incompetent to testify at appellant's trial one month later. Similarly, while Taylor's counsel advised the court that Taylor would invoke his Fifth Amendment privilege in May, we cannot definitely conclude that Taylor would

not change his mind one month later. The importance of Taylor's testimony—which might have exonerated appellant from any wrongdoing in the Abrahams slaying—demanded that the trial court explore all possible avenues to permitting appellant to subpoena Taylor. Accordingly, we conclude that the trial court should have held a second hearing, at the time of appellant's trial, directed to the issues of Taylor's competence to testify and willingness and ability to waive his Fifth Amendment privilege.

We need not, however, precisely outline the procedures to be followed where an incompetent defendant facing criminal prosecution is subpoenaed to testify at a codefendant's trial, since this issue will not arise at appellant's second trial. On January 11, 1976, Taylor was adjudged competent to stand trial. Therefore, if appellant subpoenas Taylor at this second proceeding, Taylor will likely be competent to make an informed decision regarding invocation of his Fifth Amendment privilege.

3. Alleged Prosecutorial Misconduct

■ Appellant contends that on July 12, 1975, the Winslow Police Department refused to provide appellant's investigator with certain information to which he was entitled. The cause of the police recalcitrance is in dispute: appellant claims that the United States Attorney directed the police to be uncooperative (which would constitute prosecutorial misconduct, *Gregory v. United States,* 125 U.S.App.D.C. 140, 369 F.2d 185 (1966)), while appellee claims that any failure of assistance stemmed from the police department's own attitude (which would exonerate the United States from wrongdoing, *United States v. Matlock,* 491 F.2d 504 (6th Cir. 1974)). We find it unnecessary to resolve this factual conflict, since appellant concedes that he obtained all requested information five days later, on July 17, 1975. In view of the fact that appellant suffered no more than temporary delay in preparing

his defense, we fail to see how any misconduct prejudiced appellant's rights.

Reversed.