STATE of Iowa, Appellee,

v.

Roger Alan SCHRIER, Appellant.

No. 62348.

Supreme Court of Iowa.

Sept. 19, 1979.

Judd Golden, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., and Richard L. Cleland, Asst. Atty. Gen., for appellee.

Considered by REYNOLDSON, C. J., and UHLENHOPP, HARRIS, ALLBEE, and LARSON, JJ.

UHLENHOPP, Justice.

This appeal presents the question of the propriety of a warrantless search and seizure of a small knapsack containing marijuana and related paraphernalia, lying on the floor of an automobile near the place where the driver's feet would be. *See Arkansas v. Sanders,* —— U.S. ——, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). The question comes down to whether the facts place the case on the side of the line exemplified by such decisions as *United States v. Neumann,* 585 F.2d 355 (8th Cir. 1978); and *United States v. Pugh,* 566 F.2d 626 (8th Cir. 1977) (*per curiam*), or on the other side exemplified by *United States v. Stevie,* 582 F.2d 1175 (8th Cir. 1978), and *United States v. Schleis,* 582 F.2d 1166 (8th Cir. 1978). The facts therefore play a vital role.

At about 12:15 a. m. on April 22, 1978, Officer Merrill Carns stopped defendant Roger Alan Schrier for speeding in Indianola, Iowa. Defendant had two companions with him in the front seat, a man and a young woman. The officer asked defendant for his driver's license and, smelling alcohol, also asked defendant to get out of his car. Defendant got out, and the officer arrested him for driving while under the influence of intoxicants. The officer radioed for another officer to check the other two occupants of the car for intoxication and meanwhile waited in his patrol car with defendant.

Officer James Hildreth answered the call for assistance. Hildreth had been "aware of" Roger Alan Schrier in connection with "drug-related matters" for the past four or five years. Hildreth was also familiar with bags of the type involved here; he testified, "The only thing that I have retrieved from bags like that has been a controlled substance."

Another officer, a deputy sheriff, also came to the scene; he remained in his car on the opposite side of the street and observed the situation.

Hildreth approached defendant's car from the driver's side; the door was open and the window was down. He asked the two occupants to step out. He testified at trial:

Q. Did you shine your flashlight inside the vehicle? A. Yes, sir, I did.

Q. And why did you do this? A. Well, when I told the subjects to step out of the vehicle and go to the rear, the young lady reached down like she was going to pick something up with her purse or what it was. That's when I had my light in there to see what she was reaching for.

Also:

Q. Did you observe anything in that area at that time? A. Yes, I did.

Q. And what did you observe? A. This green army bag here.

Q. And was there anything particular about the green army bag that caught your eye? A. Yes, sir. The bag was sitting like that in the car and on this side right in its pouch here was a plastic bag which contained a plant-like material.

A subsequent test showed that the plant-like material was marijuana. Hildreth further testified:

Q. So State's Exhibit No. 2 was in that left-hand pouch on the outside of State's Exhibit No. 1, the green bag? A. Yes, sir, it was.

Q. And how many inches was it protruding out of the green army bag? . . . A. I would say two and a half, maybe three.

Q. And did you have to protrude into the interior of the car in order to see that when you first saw it? A. No, sir. I was standing on the outside of the vehicle.

In addition:

Q. How close were you to the bag? A. I'd say three foot maybe.

Q. And in your opinion, how close was the girl to the bag? A. Within hand reach. She was just—it was just right there within a foot maybe.

Q. How close was Mr. Minick [the male occupant] to the bag? A. He was within two, two and a half foot.

Hildreth then proceeded as follows:

Q. And what did you do as pertains to the bag? A. After I observed the bag on the front floor of the vehicle I immediately retrieved it.

.    .    .    .

Q. Did you have occasion to look inside State's Exhibit No. 1? A. Yes, sir, I did.

Q. When did you do that? A. After I retrieved that bag from the interior of the vehicle and the people were exiting, coming around the back of the vehicle, I just pulled the lid open and looked inside.

Further regarding this part of the occurrence, Hildreth testified at a pretrial suppression hearing:

Q. You are saying, sir, you opened it right when you were outside the car. A. I'm saying I retrieved this one from it.

Q. Yes. A. I looked in the bag.

Q. The green bag, Exhibit 2 [Exhibit 1 at trial]? A. The green bag.

Q. Right when you were outside the car? A. Yes.

Q. You are sure of that? That's what you looked at first? A. That's when I looked inside of it. I didn't open it.

Q. How did you proceed to look inside? A. Just like that.

Q. I see. You lifted up the edge and looked inside that way? A. Right.

Q. Without undoing the clasp? A. Right.

Q. Did anyone give you consent to either seize that bag or look inside? A. No, sir.

The knapsack is about five and one-half inches wide, five inches deep, and eight inches high. The flap over the open end may be latched tightly or loosely depending on the adjustment of the strap. If it is latched tightly and the ends are placed over the sides of the knapsack, the contents of the knapsack are not visible. If the flap is not tight when latched, part of the contents of the knapsack may be visible at one or both sides of the flap.

Apparently the strap was not very tight at the time in question, as the officer saw part of the contents by pushing the flap aside. Regarding the nature of the bag and his observation of its contents, Hildreth testified at trial:

Q. Now is there a latch on the front of that exhibit, Exhibit No. 1? A. Yes, there is.

Q. And what was the condition of the latch or strap when you first observed it? A. It was just like it is now. It was closed.

Q. And that is a fabric latch, is it not? A. Yes, sir, it is.

.    .    .    .

Q. Did you have to unlatch it or unstrap it in order to look inside? A. No, sir, I did not.

Q. And did you unstrap it or unlatch it to look inside when you just, after you took it from the car? A. No, sir I did not.

Q. When you looked inside, what did you observe? A. I observed two or three other plastic bags with plant-like material in them.

Q. Did you have an opinion as to what those bags contained? A. Yes, sir.

Q. What did you believe they contained? A. I believed they contained a controlled substance, mainly marijuana.

A subsequent test demonstrated that Hildreth's belief about the contents constituted the fact. Further:

Q. Did you have occasion to observe anything else inside the bag at that time? A. No, sir, not at that time.

Q. Did you believe that there was articles inside the bag? A. Yes, sir.

Q. From carrying it around? A. Yes, sir.

Hildreth concluded that the two occupants of the car were not intoxicated and released them. Carns proceeded to the police station with defendant, and Hildreth also went there, bringing the green bag. Regarding events at the station in defendant's presence, Hildreth testified:

Q. When did you first unlatch the bag. A. I first unlatched the bag when I was inside the station or inside the police station.

Q. And what did you observe inside the bag? A. After I unlatched it, I dumped it out right there on the officer's desk and observed five other packages or four other packages of grass substance and also a pipe and some other articles.

. . . .

Q. Would you describe those articles? A. There is a plastic bag in there with numerous other plastic bags inside of it. There is also a small brown tray inside there and a set of scales.

Q. Is there anything else in that exhibit? Perhaps you want to refresh your memory. A. The only thing else in there would be some cigarette papers, two or three small screens, a book of matches, I believe, very small brown bottle, black lid, I believe that's it.

Hildreth testified that when he dumped the contents of the bag he also observed a small brown tray with a set of scales taped to it, a razor blade, and a green notebook.

Hildreth stated he gave defendant the *Miranda* warning and the following occurred:

Q. How did the conversation go at this point in time? A. I asked him if he wanted to talk to me about the green bag and his reply was that well, he might as well. He thought we had him this time.

. . . .

Q. As best you can recall it, what did you next ask him? A. Well, then immediately went to the green book and started turning the pages in it and asking him what the numbers and transactions were that was on the pages, and he was explaining them, what they were.

Q. What did he say to you? A. He told me that, well, some of the figures in there was that he owed people and what people owed him, and what his profits were off of certain transactions.

Q. What type of transactions? A. Drug transactions.

Q. Were there any specific drugs mentioned during this conversation? A. Yes. There was reference made to speed and pot and numerous other drugs.

. . . .

Q. Was there any talk of profit? A. Yes, sir.

Q. And would you describe that to the jury? A. He advised me on, I believe, it is the third page or one of the pages that forward of the book that he had made $260 worth of profit on one transaction.

. . . .

Q. Did he talk of what drugs he dealt in? A. He said he dealt in over a period of time in just about everything right from marijuana, right down to heroin.

. . . .

Q. Did you ask him at anytime for how long a period of time he's been dealing in drugs? A. Yes, sir.

Q. And what was that conversation? A. He advised me off and on over the years since 1969.

. . . .

Q. Was there any conversation as to the ownership of the Exhibit 1 and all the other exhibits contained therein? A. Yes, sir. He said they belonged to him.

The county attorney charged defendant with possession of a controlled substance with intent to deliver. Defendant pleaded not guilty and made a motion to suppress the physical evidence consisting of the bag and contents and also his oral statements at the station when confronted with those contents. After a hearing the trial court overruled the motion. At trial the State introduced the contents of the bag and defendant's statements, over defendant's objection. The jury found defendant guilty. After sentence, defendant appealed.

■ In this court defendant urges that the trial court should have sustained the suppression motion and also defendant's objections to the physical evidence and the oral statements. The State concedes that the physical evidence and the oral statements stand or fall together. We review

the case de novo in the light of the totality of the circumstances. *State v. Cullison*, 227 N.W.2d 121, 126 (Iowa 1975).

I. The Fourth Amendment to the United States Constitution guarantees:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Evidence obtained in violation of this guarantee is inadmissible in a prosecution, no matter how relevant or probative the evidence may be. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961).

A search and seizure without a valid warrant is per se unreasonable unless it comes within a recognized exception such as consent, search incident to arrest, probable cause and exigent circumstances, or plain view. *State v. King*, 191 N.W.2d 650, 654–55 (Iowa 1971).

II. Largely because of the mobility of motor vehicles and the diminished expectation of privacy with respect to them, the probable cause and exigent circumstances exception may, in a given case, be found to be applicable in the search of a car, where it would not apply to the search of a stationary object. *Chambers v. Maroney*, 399 U.S. 42, 48–51, 90 S.Ct. 1975, 1979–81, 26 L.Ed.2d 419, 426–29 (1970); *Carroll v. United States*, 267 U.S. 132, 150, 45 S.Ct. 280, 285, 69 L.Ed. 543, 550 (1925).

We are not dealing here with an object which is itself relevant in the particular case, such as a pistol or a crowbar; we are dealing with a knapsack, a *container*. One school of thought previously held that the so-called *Chambers-Carroll* exception for the search of a car applied to the search of items seized in the car. The United States Supreme Court laid that contention to rest for containers, however, or at least for most containers, in *United States v. Chadwick*,

433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). That case involved a locked footlocker which officers removed from a car and had in their possession for over an hour at a federal building before opening it. They had good reason to believe it contained contraband. In suppressing the evidence and distinguishing the automobile exception, the Court stated, 433 U.S. at 11–13, 97 S.Ct. at 2483–84, 53 L.Ed.2d at 548–49:

The Government does not contend that the footlocker's brief contact with Chadwick's car makes this an automobile search, but it is argued that the rationale of our automobile search cases demonstrates the reasonableness of permitting warrantless searches of luggage as analogous to motor vehicles for Fourth Amendment purposes. It is true that, like the footlocker in issue here, automobiles are "effects" under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness. But this Court has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts. . . .

Our treatment of automobiles has been based in part on their inherent mobility, which often makes obtaining a judicial warrant impracticable. Nevertheless, we have also sustained "warrantless searches of vehicles . . . in cases in which the possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not nonexistent."

The answer lies in the diminished expectation of privacy which surrounds the automobile: "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects . . . It travels public thoroughfares where both its occupants and its contents are in plain view." Other factors reduce automobile privacy. "All States require vehicles to be registered and operators to be licensed. States and localities have en-

acted extensive and detailed codes regulating the condition and manner in which motor vehicles may be operated on public streets and highways." Automobiles periodically undergo official inspection, and they are often taken into police custody in the interests of public safety.

The factors which diminish the privacy aspects of an automobile do not apply to respondents' footlocker. Luggage contents are not open to public view, except as a condition to a border entry or common carrier travel; nor is luggage subject to regular inspections and official scrutiny on a continuing basis. Unlike an automobile, whose primary function is transportation, luggage is intended as a repository of personal effects. In sum, a person's expectations of privacy in personal luggage are substantially greater than in an automobile. (Citations omitted.)

The Court recently further developed this principle in *Arkansas v. Sanders*, —— U.S. ——, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). There officers opened an unlocked suitcase taken from a car. They had good reason to believe it contained marijuana. The Court again suppressed the evidence. It stated its conclusions thus, —— U.S. at ——, 99 S.Ct. at 2593, 2594, 61 L.Ed.2d at 244–46:

> We conclude that the State has failed to carry its burden of demonstrating the need for warrantless searches of luggage properly taken from automobiles. A closed suitcase in the trunk of an automobile may be as mobile as the vehicle in which it rides. But as we noted in *Chadwick*, the exigency of mobility must be assessed at the point immediately before the search—after the police have seized the object to be searched and have it securely within their control. . . . Once police have seized a suitcase, as they did here, the extent of its mobility is in no way affected by the place from which it is taken. Accordingly, as a general rule there is no greater need for warrantless searches of luggage taken from automobiles than of luggage taken from other places.

Similarly, a suitcase taken from an automobile stopped on the highway is not necessarily attended by any lesser expectation of privacy than is associated with luggage taken from other locations. One is not less inclined to place private, personal possessions in a suitcase merely because the suitcase is to be carried in an automobile rather than transported by other means or temporarily checked or stored. Indeed, the very purpose of a suitcase is to serve as a repository for personal items when one wishes to transport them. Accordingly, the reasons for not requiring a warrant for the search of an automobile do not apply to searches of personal luggage taken by police from automobiles. We therefore find no justification for the extension of *Carroll* and its progeny to the warrantless search of one's personal luggage merely because it was located in an automobile lawfully stopped by the police.

> In sum, we hold that the warrant requirement of the Fourth Amendment applies to personal luggage taken from an automobile to the same degree it applies to such luggage in other locations. Thus, insofar as the police are entitled to search such luggage without a warrant, their actions must be justified under some exception to the warrant requirement other than that applicable to automobiles stopped on the highway. Where—as in the present case—the police, without endangering themselves or risking loss of the evidence, lawfully have detained one suspected of criminal activity and secured his suitcase, they should delay the search thereof until after judicial approval has been obtained. In this way, constitutional rights of suspects to prior judicial review of searches will be fully protected. (Citations omitted.)

III. The language of the *Chadwick-Sanders* opinions is very strong. Does the language mean that, absent exigent circumstances, a warrant must *invariably* be obtained before opening a container seized in a car notwithstanding probable cause? Justice Powell stated for the Court in *Sanders*, —— U.S. at ——, 99 S.Ct. at 2593 n.13, 61 L.Ed.2d at 245 n.13:

Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant. There will be difficulties in determining which parcels taken from an automobile require a warrant for their search and which do not. Our decision in this case means only that a warrant generally is required before personal luggage can be searched and that the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile. (Citation omitted.)

Four decisions from the Court of Appeals for this circuit have been particularly instructive on this problem, two going one way and two the other. Although all were decided before *Sanders,* the Court of Appeals appears to have anticipated and applied the *Sanders'* rationale before it was expressly stated. The first of these decisions is *United States v. Pugh,* 566 F.2d 626 (8th Cir. 1977) (*per curiam*). An officer stopped Pugh for a traffic violation. Pugh stated he had no driver's license, and when he reached in his coat pocket for papers two plastic bags containing a white substance were exposed. The officer arrested him. The car had no license plates, and the officer went to examine the identification number of the car by looking inside. He saw a partially opened briefcase containing a book entitled "Cocaine." He then searched the briefcase. The court of appeals held that items from the briefcase were admissible under the plain view exception. The court stated in 566 F.2d at 627–28:

Pugh states in his brief, without citing authority, that even if the officer observed the word "Cocaine" on the book in the briefcase, the search of the remaining contents was improper. We have considered similar contentions before and have found them unconvincing. The seizure of the book and the briefcase containing it was proper. The Government cannot now be penalized because the officer simply opened the briefcase to examine its contents and the book, thereby revealing additional evidence. Pugh's technical argument is rejected.

.   .   .   .

We do not view *United States v. Chadwick* as applicable to this case. There the Supreme Court held a warrant was necessary before forcing open and searching a double-locked footlocker that had been seized prior to transportation in an automobile, and while locked had been taken to a federal building. Here the briefcase was partially open and was examined immediately at the arrest scene. (Citation omitted.)

The second case is *United States v. Neumann,* 585 F.2d 355 (8th Cir. 1978). After officers attempted to purchase drugs of them, the Neumanns left in their car under suspicious circumstances. The officers stopped the car and the Neumanns got out. Defendant Sandy Neumann dropped a packet of heroin in so doing, and three more packets were found in her mouth. The officers searched the vehicle and removed the lid from a closed department store box located on the floor of the driver's side; the box contained demerol pills. The court upheld the search of the box, stating at pages 360–61:

This court is of the opinion that the warrant requirement in *Chadwick* should not be extended to the facts of this case. There is simply an insufficient expectation of privacy in an unsecured cardboard box sitting in plain view in the passenger compartment of an automobile. The arresting officers merely lifted the lid of the box and discovered a large quantity of pills. Unlike the situation in *Stevie,* where the officers could have seized and inventoried the locked suitcase as a unit without fear of loss or theft of the contents, here it was reasonable for the offi-

cers to promptly examine the contents of the box and later to have the drugs properly inventoried and secured. This procedure protected the legitimate interests of the arresting officers, including protection against unwarranted allegations of theft or loss, and could well have protected the interests of the Neumanns in having their property properly identified, safely kept and returned had not the box contained a controlled substance.

A third decision is *United States v. Schleis*, 582 F.2d 1166 (8th Cir. 1978). In that case an officer observed Schleis's conduct, which indicated the effects of drug injection. Other suspicious circumstances existed. The officer searched Schleis and found a bulky wallet which, when placed on a car roof, opened to reveal marijuana. Schleis also had a briefcase. Officers took Schleis to the station where one of them forced open the briefcase, revealing cocaine in plastic bags. The court held the search of the briefcase was illegal, stating at page 1172:

> The briefcase came under the "exclusive control" of the police at the time of the arrest when Schleis was handcuffed and taken into custody. The search, however, was conducted at the Burnsville jail well after the arrest and after Schleis had been locked in a jail cell. Since an evidence locker was available in which the briefcase could have been securely placed, there was no reason to believe that any evidence in the briefcase might be destroyed. Moreover, there was no reason to believe that the briefcase contained explosives or other dangerous instrumentalities.

> In short, the case is indistinguishable from *Chadwick*. Thus, the warrantless search of the briefcase was a violation of Schleis's rights under the Fourth Amendment.

The fourth case is *United States v. Stevie*, 582 F.2d 1175 (8th Cir. 1978). There officers apprehended two individuals under suspicious circumstances indicating that they probably had drugs in two suitcases which they brought on an airplane and placed in a rented car. The officers stopped the car, arrested the individuals, and opened one of the suitcases, which contained bricks of marijuana. The court held this search of the suitcase to be illegal and stated at pages 1178-79:

> The government first seeks to justify the search of the suitcase under the automobile exception to the Fourth Amendment warrant clause. The Supreme Court "has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts," because of both the inherent mobility, and the diminished expectation of privacy, in a motor vehicle. It is clear in this case that the law enforcement officers could legitimately immobilize the station wagon and seize the suitcases located in the rear pursuant to the automobile exception. It does not necessarily follow, however, that the contents of the suitcases located in the station wagon are subject to search under the automobile exception, anymore than they would be if the officers had seized them any other place. As the Supreme Court has noted, "[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." (Citations omitted.)

Further:

> The Ninth Circuit, in sustaining the search of a suitcase taken from a car, has held that *Chadwick* does not apply to luggage taken directly from an automobile. We cannot read *Chadwick* in this manner. The Court in *Chadwick* clearly held that an individual has a legitimate expectation of privacy in the contents of luggage. Every factor which the Court cites in support of its holding remains present whether the luggage is *inside* or *outside* an automobile. Moreover, no Supreme Court decision directly supports the Ninth Circuit's position, and every Court of Appeals decision supporting the position was decided prior to the Supreme Court's decision in *Chadwick*.

We conclude, therefore, that the appellant's expectation of privacy in the contents of the suitcase was not dissipated because they placed it in the rear of a station wagon. (Citation omitted.)

IV. What do these cases tell us about the case at hand? We have no doubt that Carns acted properly in stopping the car for speeding and in arresting defendant, and also that Hildreth acted properly in requesting the other two occupants of the car to alight, in flashing his light into the car when the woman reached down, and in removing the knapsack from the car. But did Hildreth transgress the proscription on unreasonable searches and seizures when, without unlatching the bag, he then peered into it by pushing the flap aside and, upon seeing the contents, in later opening the bag at the station and emptying its contents?

The answer appears to turn on whether, under the circumstances, defendant had a reasonable expectation of privacy regarding the contents. One of the circumstances was the presence of a plastic bag of marijuana on the exterior of the knapsack, protruding two or three inches. This indicates a certain nonchalance about the marijuana. True, the plastic bag on the outside would probably indicate only possession, whereas the articles inside indicated possession with intent to deliver. Nonetheless, placing the plastic bag on the outside reveals defendant's attitude in the matter of privacy or secrecy with respect to the marijuana. It also recalls Justice Powell's remark, "Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance." *Arkansas v. Sanders*, —— U.S. at ——, 99 S.Ct. at 2593, 61 L.Ed.2d at 245 n.13.

The nature of the knapsack points in the same direction. While the bag had a latch, it was not constructed like a footlocker, briefcase, or suitcase which securely conceals articles from view unless unlatched. Unless the strap was tight and the sides of the flap were pulled down, contents of the knapsack became visible by simply pushing the flap aside, as on this occasion.

We believe that the facts here do not reveal a reasonable expectation of privacy such that, after Hildreth properly seized the bag, he acted *unreasonably* in looking into it at the scene. To hold otherwise would require us to tell the officer that although he knew the bag contained what appeared to be marijuana in its pouch, he could not look in the main compartment of the bag by pushing aside the flap.

We must also consider the events at the station. After Hildreth saw the bag of marijuana protruding from the exterior pouch and also saw bags of marijuana in the main part of the bag, we think the fourth amendment did not require him to obtain a warrant before unlatching the bag and removing the contents. Events flowed in natural sequence. True, Hildreth then saw other items, but he had already seen what appeared to be marijuana on the outside and also on the inside. To require a warrant at this point would exalt form over substance and require us to tell the officer that although he had looked inside the main compartment of the bag he could not open it up and empty it out. In sum, under the particular circumstances of this case the officer's conduct at the scene and at the station house does not appear to constitute an unreasonable search and seizure.

In so holding we fully appreciate the constrictions of *Sanders* and *Chadwick* in the search and seizure of containers and the necessity of applying those decisions with full vigor whether a car is or is not involved. We do not believe, however, that those cases hold a warrantless search and seizure of a container is never permissible under any state of facts. This state of facts appears to us to render the search and seizure reasonable.

The trial court decided the Fourth Amendment issue correctly.

AFFIRMED.