**STATE of Iowa, Plaintiff–Appellant,**

v.

**John William BINGHAM, Defendant–Appellee.**

**No. 05–0510.**

Court of Appeals of Iowa.

April 12, 2006.

---

268

Linda Del Gallo, State Appellate Defender, and David Arthur Adams, Assistant Appellate Defender, for appellee.

Thomas J. Miller, Attorney General, Karen Doland, Assistant Attorney General, John P. Sarcone, County Attorney, and Nan Horvat, Assistant County Attorney, for appellant.

Heard by HUITINK, P.J., and MAHAN and HECHT, JJ.

HECHT, J.

The State appeals from the district court's suppression of relevant evidence. We now reverse.

## I. Background Facts and Proceedings.

On the evening of August 17, 2004, Detective Judy Stanley of the Des Moines police department responded to a call directing her to go to the residence of Barbara Gaston. Upon gaining entry to the locked residence, Stanley and other officers discovered Gaston's body. Stanley learned from Gaston's neighbor that John Bingham, Gaston's nephew, also lived at the residence. On suspicion of foul-play,

Stanley issued a stop-and-hold order on Gaston's vehicle and its driver.

Later that same evening, Bingham was arrested driving Gaston's vehicle, and was cited for several traffic violations. Bingham was not read *Miranda* warnings at the scene of the arrest, but he was handcuffed and subsequently transported to the Des Moines police station. Bingham was placed in a small interview room in one of the upper floors of the station. Although Bingham's handcuffs were removed on his agreement to behave, Bingham was seated behind a large table that was located between him and the open door. It is clear from the videotape made of Stanley's interview with Bingham that at least one officer was stationed outside the door to the interview room.

Although Bingham was informed that the stationhouse was considered a smoke-free environment, he was offered a soda and several cigarettes during his time in the interview room. As Stanley was preparing to read Bingham his *Miranda* rights, Bingham informed her that he had not yet been advised of his rights. Stanley informed Bingham that field officers generally do not provide *Miranda* warnings. Stanley then asked Bingham if he needed to use the bathroom before they proceeded with the interview, to which Bingham replied "[n]o, I would like a lawyer though."

In response, Stanley asked Bingham if he had a particular lawyer he had used in the past. Bingham told Stanley that Thomas Crabb was a public defender that had represented Bingham on a previous charge. Stanley then retrieved a phone book to look up Crabb's telephone number. A call was placed to Crabb's law office in Des Moines, but because of the late hour, the attempt to reach the lawyer was unsuccessful. Stanley later testified that she did not expect to reach Crabb at his office at that hour, but instead hoped to glean other information that would allow her to contact Crabb at home. Bingham was then asked whether he knew any another attorney, but he was unable to recall any particular name. Officers then proceeded to use driver's license records to obtain Crabb's home address in Urbandale. Stanley contacted the Urbandale police department and requested that Crabb be contacted at his residence.

Detective Stanley again asked Bingham if there was another attorney he had used in the past, and Bingham identified a person named "Scott" who worked in Crabb's law office. Stanley again contacted the Urbandale dispatcher and received word that an officer had been dispatched to Crabb's address with instructions for Crabb to call Stanley. Stanley informed Bingham of this development, and then asked him "do you want to wait?" Bingham responded "[I]t don't matter." Stanley then said, "well you're the one who asked for an attorney." Bingham explained:

> I just want him to be present so I don't say the wrong thing. [Crabb] always told me just have a lawyer present ... I'm not legally smart as he is and may say the wrong thing.

Stanley responded, "[t]hat's your right, are you sure?" Bingham did not respond.

When Bingham subsequently expressed uncertainty about whether Crabb would come to meet with him, Stanley responded "[w]ell we'll call him and ask him, I mean, I don't have anything to do with lawyer stuff, a lot of times they don't, only because they have to be assigned." Immediately thereafter, Bingham responded "[i]f you want I'll talk to you guys, it don't matter." Stanley then stated: "[w]ell it will save [Crabb] a phone call if you'd rather do without," to which Bingham responded "[w]e can talk."

Stanley then read Bingham his *Miranda* rights and Bingham signed a written waiver form, acknowledging that he understood and knowingly waived his right to silence. Bingham then made several incriminating statements concerning his involvement in the death of his aunt and his subsequent disposal of evidence linking him to the killing.

On the strength of his confession and evidence derived from it, Bingham was charged with first-degree murder. Bingham filed a motion to suppress his confession and its fruits, asserting that both were obtained by police in violation of his Fifth Amendment privilege against self-incrimination. Specifically, Bingham alleged that Detective Stanley failed to honor Bingham's unequivocal request for counsel to be present at the interrogation.

During oral argument at the hearing on the motion to suppress, and through its written brief submitted to the district court, the State claimed (1) Bingham reinitiated conversation with investigators after asserting his right to counsel, (2) Bingham waived his right to counsel, and (3) Bingham's subsequent confession was voluntary. The district court rejected the State's position, finding instead that (1) police did not exhaust efforts to locate Crabb or other suitable counsel, and (2) Detective Stanley continued conversation with Bingham after his unequivocal request for counsel and made several statements suggesting the unlikelihood of obtaining Crabb's presence. The district court concluded Bingham had not voluntarily waived his Fifth Amendment right to counsel, and suppressed Bingham's confession and any evidence resultantly obtained.

The State sought and obtained discretionary review of the district court's ruling on the motion to suppress. On appeal, the State contends Bingham's Fifth Amendment right to counsel had not yet attached when he attempted to invoke it prior to receiving *Miranda* warnings. The State maintains the district court's reinitiation and waiver analysis are therefore inapposite.

## II. Scope and Standard of Review.

We review constitutional issues de novo. *State v. Biddle,* 652 N.W.2d 191, 200 (Iowa 2002). Any evidence obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination is inadmissible, and should be suppressed regardless of its relevance and probative value. *Mapp v. Ohio,* 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961); *State v. Schrier,* 283 N.W.2d 338, 342 (Iowa 1979).

## III. Discussion.

### A. Preservation of the State's Attachment Theory.

■ As mentioned above, the State asserts on appeal that Bingham's unequivocal request for counsel at the onset of the interview process was ineffective because custodial interrogation had not formally begun. *See State v. Peterson,* 663 N.W.2d 417, 424 (Iowa 2003) (concluding that *Miranda's* Fifth Amendment safeguards attach only when a person in custody is subjected to either express questioning or its functional equivalent that is "reasonably likely to elicit an incriminating response"). We note, however, that this is the first time this challenge to the attachment of Bingham's Fifth Amendment rights has been raised by the State in these proceedings as a succinct legal argument. While it appears that Bingham's counsel made reference to the issue during

oral argument on the suppression motion,[1] the State's district court brief and the hearing transcript do not reveal that the State expressly presented to the district court the argument now advanced on appeal.

Our supreme court has clearly stated that our error preservation rules apply with equal force to the State as they do to a criminal defendant. *DeVoss v. State*, 648 N.W.2d 56, 63 (Iowa 2002). We may therefore reverse the district court's suppression ruling on this ground only if the State sufficiently presented it to the district court. *See Fencl v. City of Harpers Ferry*, 620 N.W.2d 808, 818–19 (Iowa 2000) (reversing district court's ruling quieting title in favor of city based on an equitable estoppel theory urged by appellant below but improvidently rejected by the district court). "It is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider." *Sorci v. Iowa Dist. Court*, 671 N.W.2d 482, 489 (Iowa 2003).

The State argues on appeal that we should excuse its failure to expressly assert the theory in the district court because Bingham's motion framed the issues and thus the State's resistance. We are disinclined to do so, however, where the State failed to seek a district court ruling on the theory before seeking discretionary review. *See* Iowa R. Civ. P. 1.904. Our courts have held that a motion to reconsider "is essential to the preservation of error when a trial court fails to resolve an issue, claim, defense or legal theory properly submitted for adjudication." *Arnold v. Lang*, 259 N.W.2d 749, 753 (Iowa 1977); *see also Starling v. State*, 328 N.W.2d 338, 341 (Iowa Ct.App.1982) (finding implicit support for an identical error preservation requirement in the context of a criminal appeal).

■ Because we conclude the State failed to preserve its contention that custodial interrogation had not commenced when Bingham sought to assert his right to counsel, we deem the contention waived and proceed with our analysis assuming, as the district court did, that Bingham's request for counsel was properly invoked.[2]

1. At the suppression hearing, the State failed to expressly argue that Bingham's right to counsel had not attached because custodial interrogation had not commenced. The only reference in the district court record to the commencement of interrogation was made by Bingham's attorney, who noted that "the real contention in this whole analysis—and I think [the county attorney] was asking questions concerning it—centers around whether or not Mr. Bingham was in fact interrogated."

2. We note in passing that the foundation of the State's custodial interrogation argument appears to be that Bingham could not invoke his right to counsel immediately before the *Miranda* warnings were read to him. The State asserts that where the suspect is arguably in custody, the interrogation does not commence until the *Miranda* warnings are read to the suspect. *See McNeil v. Wisconsin*, 501 U.S. 171, 182, 111 S.Ct. 2204, 2211, 115 L.Ed.2d 158, 170, n. 3 (1991) (stating "[w]e have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation' "). However, we do not read *McNeil* as establishing the reading of the warnings as the absolute trigger for the attachment of the Fifth Amendment right of counsel. Indeed, the *McNeil* court emphasized "[m]ost rights must be asserted when the government seeks to take the action they protect against." *Id.* Here, the custodial interview process against which the right is designed to protect was already set in motion when Bingham made his invocation. With regard to the State's suggestion that interrogating questions had yet to be asked, we note that the reading of *Miranda* rights is no more interrogation than an offer of soda or a cigarette, and as such is an equally arbitrary point for starting the window of opportunity for invoking the right to counsel. In our view, the danger that anticipatory invocations may (1) not be adequately communicated to investigating offi-

## B. Avoidance of Subsequent Interrogation.

■ Having concluded for purposes of this appeal that Bingham properly invoked his Fifth Amendment right to counsel, we must now focus our analysis on whether the State honored or worked to undercut the request. The Supreme Court has consistently held that once a suspect properly invokes the Fifth Amendment right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 383 (1981). The fact that "authorities may not initiate questioning of the accused in counsel's absence" following an unequivocal invocation of the right is born out of respect for the suspect's decision to deal with the police only through counsel. *Minnick v. Mississippi*, 498 U.S. 146, 152–53, 111 S.Ct. 486, 490–91, 112 L.Ed.2d 489, 493 (1990).

After a careful review of the record, we conclude that none of the questions posed by Detective Stanley after Bingham's invocation and prior to the waiver were designed to elicit an incriminating response from Bingham. *See Peterson*, 663 N.W.2d at 424. It was Bingham who first brought the conversation back to the issue of his aunt's death by stating "[i]f you want I'll talk to you guys, it don't matter." Detective Stanley did not direct Bingham's attention to the subject of the homicide until after Bingham signed a written waiver. All of Stanley's earlier questions were focused on the objective of obtaining for Bingham an attorney of his choice in compliance with his specific request for counsel. We therefore conclude Detective Stanley properly avoided all questions related to the homicide until after Bingham executed the waiver.

## C. Attorney Search and Voluntary Waiver.

■ As is the case here, where a statement is made subsequent to a Fifth Amendment invocation by a suspect without the presence of an attorney, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his ... right to retained or appointed counsel." *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 720 (1966).

In support of the district court's conclusion that Detective Stanley did not obtain a valid waiver of the Fifth Amendment privilege from Bingham before eliciting incriminating responses, Bingham asserts that the search for attorney Crabb was itself sufficiently coercive to vitiate any subsequent waiver. *See Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 209 (1979) (stating "the relinquishment of the [Fifth Amendment] right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"). Due to the late hour of the interview, Bingham asserts he was confronted with the likelihood that no attorney, much less Crabb, could be made available to represent him during the interview. Bingham contends Stanley's effort to locate Crabb was merely an artifice designed to undermine Bingham's confi-

cers, or (2) place undue restrictions on legitimate law enforcement, tends to evaporate where the right to counsel is unequivocally invoked at the start of a custodial interview directly to the officer conducting the inter-

view. As such, we believe these factors militate against the bright-line rule advocated by the State in favor of a case-by-case analysis into the validity of an anticipatory invocation of the right to counsel.

dence that his invocation would yield the presence and protections of counsel. As proof of the State's ulterior motive, Bingham notes Stanley's own admission that she did not believe an attorney, especially a public defender, would be willing to come down to the police station at such a late hour. We therefore must decide whether Bingham's waiver of his right to counsel was voluntary under the circumstances presented here.

Forcing a suspect who has invoked his right to counsel to remain in an interrogation setting while awaiting counsel's arrival could, under certain facts, be viewed as so coercive that it vitiates a subsequent waiver of constitutional rights. Indeed, the Supreme Court has recognized that the right to terminate questioning attendant to the invocation of counsel is designed in part to thwart the coercion inherent in the custodial interrogation setting. *See Miranda*, 384 U.S. at 474, 86 S.Ct. at 1628, 16 L.Ed.2d at 720 (stating "[w]ithout the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked").

However, the indicia of coerciveness necessary to void a Fifth Amendment waiver must rise above the inherent coercion of the interview's setting. *See State v. Ware*, 205 N.W.2d 700, 703 (Iowa 1973) (holding that confessions "extracted by any sort of threats or violence," or obtained by either promises of leniency or the "exertion of any improper influence" violate the Fifth Amendment, and could not be used at trial). We conclude under the circumstances of this case that Bingham's decision to withdraw his request for counsel was not the product of undue coercion.

First, we note that Bingham was situated in the interview room for less than an hour before he agreed to sign the waiver form.[3] During that time he was generally left alone, and was provided with soda, cigarettes, and restroom access. We could more easily view the interview setting as sufficiently coercive to vitiate the waiver if officers had (1) left Bingham in this setting for a considerably longer period without the comforts he was afforded, and (2) halted efforts to locate counsel and otherwise denied Bingham the means to solicit counsel's presence. *See U.S. v. Womack*, 542 F.2d 1047, 1049–51 (9th Cir.1976) (finding absence of voluntary waiver where the government took no action to secure indigent suspect an attorney despite suspect's repeated requests).

Second, we note that it was Bingham who first questioned whether a public defender would come down to the station at that hour even if one were successfully contacted. It was only after Bingham expressed such doubt that Stanley remarked "[w]ell we'll call him and ask him, I mean, I don't have anything to do with lawyer stuff, a lot of times [public defenders] don't [come down to the station], only because they have to be assigned." Had Stanley directly introduced, attempted to amplify, or manipulated Bingham's doubts about the prospects for obtaining an attorney, we would be more apt to find the waiver was involuntary.[4]

---

**3.** The record indicates that Bingham was arrested for traffic offenses at approximately 9:56 p.m. Detective Stanley testified that Bingham arrived at the station about ten minutes later. The transcript of Bingham's subsequent confession indicates that the interrogation actually commenced at 10:40 p.m., a little more than thirty minutes after Bingham was placed in the interview room.

**4.** In concluding that the waiver Bingham signed was not the product of voluntary choice, the district court made much of the fact that efforts to search for an attorney had not been exhausted at the time the waiver was

Based on this record, however, we conclude that Bingham's waiver of his right to counsel was not the product of coercion occasioned by either the setting or duration of the conversation, or the fruitless search for attorney Crabb initiated by officers in response to Bingham's request for counsel. As noted above, Bingham's request for a lawyer generally prohibits police from engaging in any interrogation efforts until such time as a lawyer can be made available to Bingham. *Edwards*, 451 U.S. at 484–85, 101 S.Ct. at 1885, 68 L.Ed.2d at 383. Police investigating a homicide have an important temporal interest in obtaining evidence that must be considered alongside Bingham's right to delay interrogation. Not only is this law enforcement interest advanced by the actions taken by Detective Stanley, but we also believe the risk of eroding a suspect's confidence in the protections afforded by the Fifth Amendment is far greater when the police fail to act on the request than when they actively aid the suspect in locating counsel of his choice. *See Womack*, 542 F.2d at 1049–51. We therefore decline to conclude that Bingham was incapable, after requesting counsel, to voluntarily waive his right to counsel and submit to interrogation as a consequence of the manner in which the State's agents attempted to contact Bingham's counsel of choice.

## IV. Conclusion.

Because (1) Bingham's invocation of his right to counsel was properly honored by police while it remained extant, (2) Bingham initiated conversation concerning the homicide investigation after he requested counsel, and (3) Bingham voluntarily waived his Fifth Amendment right to counsel, we conclude the confession and evidence obtained from the subsequent interrogation should not be suppressed. We therefore reverse the district court's ruling on the motion to suppress and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

obtained. We agree that sufficient coercion could be found had police introduced doubts about the availability of an attorney before search efforts were exhausted, especially where the suspect was not permitted to personally engage in those efforts. But, as was noted, we do not find Stanley's conduct or statements were calculated to amplify or encourage Bingham's doubts about the availability of counsel.