**Michael SORCI and the Youth Law Center, Plaintiffs,**

v.

**The IOWA DISTRICT COURT FOR POLK COUNTY, Iowa, Defendant.**

**No. 03–0936.**

Supreme Court of Iowa.

Nov. 13, 2003.

Lee H. Gaudineer of Gaudineer, Comito & George, L.L.P., Des Moines, for plaintiffs.

Thomas J. Miller, Attorney General, and Cristen C. Odell, Assistant Attorney General, for defendant.

STREIT, Justice.

The Youth Law Center, a non-profit organization which provides legal represen-

tation to children, challenges three administrative orders of the Chief Judge of the Fifth Judicial District. The administrative orders removed Youth Law Center (YLC) lawyers from hundreds of cases, on account of an alleged conflict of interest on the part of its (now former) executive director, Martha Johnson. We affirm the district court's removal of the YLC from cases in which Johnson had substantial responsibility as an assistant county attorney. Because the YLC should be permitted to rebut the presumption its lawyers still possess confidential information now that Johnson has left the YLC, however, we reverse, in part, and remand for further proceedings.

## I. Facts and Procedural Background[1]

From 1999 to 2002, Martha Johnson worked as an assistant county attorney for Polk County, Iowa. Johnson worked in the juvenile division of the office. From July 2001 to August 2002, she was an intake attorney.

Approximately 1100 Child In Need of Assistance (CINA) petitions were initiated while Johnson was intake attorney. Johnson filed and signed CINA petitions after receiving a request for intervention from the Department of Human Services (DHS). DHS would contact the county attorney's office and forward the pertinent information to one of two non-lawyer intake specialists. The intake specialists would prepare each CINA petition by filling in blanks in a standard form using information DHS provided. Johnson reviewed the petition. If she found it ac-

---

1. The record in this case consists of three administrative orders from the district court, although copies of other documents, which set forth the facts and prior procedural history of the case, were filed with the court.

Because of the unusual circumstances of this case and the fact that neither party apparently objects to the use of these materials, we consider them.

ceptable, Johnson signed and filed it in the district court.

Johnson considered DHS her client. Johnson actively worked with DHS case workers, medical personnel, and other professionals to determine when CINA petitions ought to be filed. In addition to signing and filing CINA petitions, in some cases Johnson would prepare and file applications for the temporary removal of children from their homes. On occasion, Johnson also represented the State at removal hearings. Johnson was the contact person for DHS in the county attorney's office whenever it needed a court order.

In late 2002, Johnson resigned from the Polk County Attorney's Office, and became the executive director of the YLC. The YLC is a non-profit organization which provides legal representation to children and is under contract to the State Public Defender's Office. The YLC has an executive director and five staff attorneys. The Polk County Juvenile Court regularly appoints YLC attorneys to serve as guardians ad litem for children.

When apprised of Johnson's move, District Associate Judge William Price advised Johnson to obtain a formal opinion from the ethics committee of the bar association concerning any potential conflicts of interest in her new position as YLC director. Neither Johnson nor the YLC sought such an opinion. Johnson did, however, receive a letter from the Administrator of the Polk County Department of Human Services for the Des Moines Service Area, in which the Administrator "waive[d] any conflict or appearance of a conflict that may arise from Ms. Johnson's change in employment."

Upon her hire, the YLC did not erect a so-called Chinese Wall, a screening device for lawyers who may have conflicts of interest. *See Doe v. Perry Cmty. Sch. Dist.*, 650 N.W.2d 594, 601 (Iowa 2002) (approv-

ing use of Chinese Walls to overcome imputed disqualification in certain circumstances). As executive director of the YLC, Johnson had access to the organization's case files, although she stated she did not touch them unless she was filing papers. Johnson admitted the YLC "operates on a pretty open basis" and she had, from time to time, heard other lawyers talking about cases in which she had been involved while working in the county attorney's office. Johnson participated in some of these conversations. On at least one occasion a subordinate attempted to consult Johnson about a case in which Johnson had prior involvement as assistant county attorney. Johnson told the subordinate to "handle [it] on her own."

The issue of Johnson's potential conflict of interest rapidly created a predicament for the Polk County Juvenile Court. On May 5, 2003, Judge Robert Blink disqualified, on the motion of the child's mother, a YLC attorney from a contested termination case in which Johnson had actively participated as assistant county attorney. Judge Blink ruled Johnson's conflict imputed to the YLC attorney and disqualified the YLC, finding Johnson's prior involvement on the case had been "substantial and significant."

The next day, Johnson sent a letter to the Polk County juvenile judges and to the Chief Judge of the Fifth Judicial District, Arthur Gamble. Johnson informed the judges she had advised YLC attorneys to "raise the issue of conflict of interest at every hearing they attend." Johnson told the judges she would prepare a waiver for YLC attorneys to present to the other parties and the court. Johnson asked the judges if the standard for disqualification was indeed "substantial and significant" as Judge Blink had ruled, and invited "any opinion or direction" the judges might wish to share with her. Johnson also of-

fered to urge the YLC Board of Directors to seek a formal ethics opinion, if the judges so desired.

The next week, Johnson sent another letter to the judges. She gave the judges a description of her duties in the county attorney's office, a list of cases in which she had substantial and significant participation, and the DHS waiver. Johnson also offered to prepare a list of YLC cases, categorized by dates, which could be screened for substantial and significant involvement.

On May 19, 2003, Judge William Price held an evidentiary hearing in a contested permanency case to determine whether another YLC lawyer, Michael Sorci, had a conflict of interest. Both parents had moved to disqualify Sorci for a conflict of interest. On May 28, Judge Price disqualified Sorci because of Johnson's prior involvement in the case.

In the case before him, Judge Price found Johnson had, among other activities, reviewed, signed, and filed the CINA petition; completed, executed, and swore to the application for order of temporary removal; prepared orders for temporary removal and a removal hearing; appeared on behalf of the State at the removal hearing; and represented the State at the pre-trial conference. On occasion, DHS may have told Johnson the identity of the child abuse reporter in a juvenile case—confidential information which may not be disclosed to other parties. Finding Johnson's involvement was significant and substantial as assistant county attorney, Judge Price disqualified Sorci. He also noted "the appearance of impropriety is real and in this matter extensive."

On May 22, 2003, Chief Judge Arthur Gamble met with Johnson and two other YLC representatives, including attorney Victoria Herring, president of the YLC. There is no record of the meeting, but less than a week later Herring faxed a letter to Judge Gamble which set forth YLC's position on the conflict of interest and proposed solutions to what was, by then, a growing problem in the district court. Herring's letter, among other things, urged the court to consider the conflict issue on a case-by-case basis. The YLC agreed not to contest conflicts in 221 cases where Johnson was alleged to have had substantial responsibility as assistant county attorney; Herring urged the court, however, to implement "a procedure for orderly determination" in "275 or so cases" in which "the substantial responsibility criterion is not clear or contested."

On May 28, Chief Judge Gamble issued administrative order 2003–14. In his order, Chief Judge Gamble noted the YLC conflict-of-interest issue "is arising daily before the Court"; the "situation seriously interferes with the orderly administration of the juvenile court ... due to continuances caused by uncertainty and litigation concerning the disqualification and substitution of counsel for the children ..."; and it "compromises the Court's ability to comply with state and federal guidelines...." Although Chief Judge Gamble recognized "[i]n less obvious circumstances, case-by-case adjudication of potential conflicts is appropriate," he rejected such a method in the present situation because it is "unnecessary litigation and is detrimental to the administration of justice."

Chief Judge Gamble, citing in part DR 9–101(B) of the Iowa Code of Professional Responsibility for Lawyers,

> disqualified and removed [the YLC] from the representation of children in any pending case where ... Martha Johnson acted as counsel for the State of Iowa as an assistant Polk County Attorney including but not limited to all cases where Martha Johnson: (a) com-

municated or provided legal advice to DHS social workers, other prosecutors or agents of the State concerning the subject matter of the case; (b) authored any correspondence or reports concerning the subject matter of the case; (c) signed pleadings filed in the case on behalf of the State; or (d) appeared before the court in proceedings in the case on behalf of the State.

In these cases, the district court concluded Johnson had "personally and substantially participated in the representation of the State.... No further hearing is necessary."

In addition, Chief Judge Gamble ordered the YLC to conduct a review of

its representation of children in all other pending and future court appointments and report to the Court on an ongoing basis whether or not prior activities by Martha Johnson might be or become involved in the case.... Such prior activities may include but are not limited to representation of the State or consultation with agents of the State in another case involving the same child, a sibling or a parent of the child in interest.

Citing our recent decision in *Doe*, 650 N.W.2d at 598, where we reiterated our three-factor test for determining a "substantial relationship" for the disqualification of an attorney for a conflict of interest, Chief Judge Gamble ordered the YLC to disclose in such cases

(1) the nature and scope of Martha Johnson's prior activities as counsel for the State; (2) the nature of the present action and [YLC]'s representation of the child in interest; and (3) whether agents of the State might have disclosed a confidence to Martha Johnson which could be relevant to the present action.

Chief Judge Gamble required the YLC to submit a report in each pending and future case taking into account these three fac-

tors and ordered "[t]he judge of the juvenile court assigned to each case [to] review this report to determine whether a conflict of interest or an appearance of impropriety requires disqualification of the [YLC]."

The YLC filed a motion to reconsider. The motion informed the court Johnson resigned her position as executive director of the YLC on June 4, 2003. The court refused to remove the imputation of conflict and denied the YLC's motion in administrative order 2003–17.

The YLC then filed a motion to enlarge or amend administrative order 2003–17. The YLC pointed out this court has, at times, relied upon Restatement (Third) of the Law Governing Lawyers [hereinafter Restatement] in reaching decisions. *See, e.g., Tausz v. Clarion–Goldfield Cmty. Sch. Dist.*, 569 N.W.2d 125, 129 (Iowa 1997). Because the Restatement permits, in limited circumstances, the removal of imputation of conflict once the personally prohibited lawyer leaves her new firm, the YLC again urged the Court to rescind its prior administrative orders. *See* Restatement § 124(1). In administrative order 2003–18, the district court denied the motion and rejected the Restatement position. *See* 7A C.J.S. *Attorney & Client* § 164, at 238–39 (1980) (recognizing view which rejects removal of imputation once personally prohibited lawyer leaves new firm).

On June 17, Sorci and the YLC petitioned this court for a writ of certiorari and a request for a stay, claiming they have been illegally and summarily removed from the representation of six hundred children. On July 28, we granted certiorari and stayed the administrative orders to the extent the orders had not yet been implemented. We also expedited review.

## II. Scope of Review

In an original certiorari proceeding, our review is for errors at law. *State*

*Pub. Defender v. Iowa Dist. Ct. for Black Hawk County*, 633 N.W.2d 280, 281–82 (Iowa 2001). A writ of original certiorari lies where the district court has acted illegally. Illegality exists when the court's findings lack substantial evidentiary support, or when the court has not properly applied the law. *Id.* (citing *Christensen v. Iowa Dist. Ct. for Polk County*, 578 N.W.2d 675, 678 (Iowa 1998)).

### III. The Merits

Sorci and the YLC raise a myriad of issues before this court. Their arguments boil down to three contentions: (1) in issuing administrative order 2003–14, Chief Judge Gamble exceeded the authority granted to his office by the Iowa Constitution, the Iowa Code, and the Iowa Rules of Court; (2) the district court applied the wrong disciplinary standard—improperly disqualifying a former government lawyer where she did not previously have substantial responsibility; and (3) in administrative orders 2003–17 and 2003–18, the chief judge erroneously failed to rescind administrative order 2003–14 after Johnson resigned.

The State, in turn, denies all of these claims, and, in addition, alleges, for the most part, Sorci and the YLC did not preserve error on the first two issues, because plaintiffs did not raise them in the district court.[2] The State concedes plaintiffs preserved error for the third argument, because they raised this issue in their motion to reconsider and motion to enlarge or amend.

2. In its brief, the State concedes the plaintiffs preserved error on the limited issue that Chief Judge Gamble lacked the inherent authority to issue administrative orders. The State alleges plaintiffs preserved error on that issue because it constitutes an allegation that "the administrative orders are illegal." Insofar as the Chief Judge abused his discretion or im-

### A. Preservation of Error

■■■ The State alleges, as a threshold matter, plaintiffs did not preserve error on most of the issues argued before us. We agree. We begin with the principle, based upon considerations of fairness, that this court is not ordinarily a clearinghouse for claims which were not raised in the district court:

[I]t is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider. Furthermore, it is unfair to allow a party to choose to remain silent in the trial court in the face of error, taking a chance on a favorable outcome, and subsequently assert error on appeal if the outcome in the trial court is unfavorable.

*DeVoss v. State*, 648 N.W.2d 56, 60 (Iowa 2002) (citing 5 Am.Jur.2d *Appellate Review* § 690, at 360–61 (1995)).

■■■ "Certiorari arises from the supervisory function which the supreme court exercises over all lower courts within the state." *Hadjis v. Iowa Dist. Ct., in and for Linn County*, 275 N.W.2d 763, 765 (Iowa 1979) (citations omitted). "The rule is well established that in certiorari actions we will not review questions not presented to the so-called inferior tribunal...." *Lenertz v. Mun. Court of the City of Davenport*, 219 N.W.2d 513, 515 (Iowa 1974) (refusing, in original certiorari action, to consider constitutional claims which plaintiffs did not raise in lower court) (citations omitted); *see, e.g., Henley v. Iowa Dist. Ct. for Emmet County*, 533 N.W.2d 199, 201 n.

properly directed or influenced a judicial officer, however, the State maintains plaintiffs did not preserve error. Of course, any allegation the court acted unconstitutionally or contrary to a statute is an allegation it acted illegally. A mere allegation of illegality does not preserve error.

2 (Iowa 1995) (refusing to consider a claim presented in an original certiorari action because error was not preserved); *see also* 14 Am.Jur.2d *Certiorari* § 102, at 703 (2000) ("Failure to raise an argument in the court below will preclude its determination in a certiorari review.").

The plaintiffs argue that because this is an "original certiorari proceeding" our error preservation rules do not apply. Rather, plaintiffs claim the petition, if granted by this court and not resisted by the "Defendant Judge" on error preservation grounds, such an argument is waived, and the petition "defines" the issues for our review.

 We reject this argument, and can find no legal authority for making an exception to our error preservation rules in the present case. Although this is an original certiorari proceeding pursuant to the Iowa Rules of Appellate Procedure 6.301 *et seq.,* we do not have original jurisdiction. As we have previously stated, and plaintiffs admit,

> Applications to this court for writs of certiorari are sometimes referred to as original proceedings, but that is not the equivalent of saying that in granting of said writs the court exercises original jurisdiction. The granting of writs of certiorari by this court are original proceedings only in a very limited sense inasmuch as the function of the writ is to bring before this court for review in a particular manner a limited class of errors alleged to have been committed by inferior judicial tribunals, namely, those which result from such tribunals exceeding their jurisdiction or otherwise acting illegally. The only purpose which the writ serves is to annul proceedings of such inferior judicial tribunals. No other relief can be granted. What is accomplished, therefore, by means of the writ is the correction of a particular class of errors at law committed by inferior judicial tribunals.

*Eden Township Sch. Dist. v. Carroll County Bd. of Educ.,* 181 N.W.2d 158, 165–66 (Iowa 1970) (citing *Indep. Sch. Dist. v. Samuelson,* 220 Iowa 170, 171, 262 N.W. 169, 170 (1935)). Because the district court cannot, logically, be inferior to itself, our court rules require a writ of certiorari complaining of a district court action to be filed in a superior court, the supreme court. *See* Iowa R. Civ. P. 1.1404 ("The writ [of certiorari] may be granted only by the district court acting through a district judge unless it is directed to that court, a district judge, or a district associate judge, and then by the supreme court or a justice thereof."); *State Public Defender,* 633 N.W.2d at 281–82.

 Moreover, Iowa Rule of Appellate Procedure 6.301 requires a plaintiff to "state [in the petition for certiorari] whether the plaintiff raised the issue in district court...." The plaintiffs failed to do so. This requirement does not exist merely to satisfy our curiosity; rather, the requirement parallels the oft stated maxim that we will only consider issues for which error has been preserved. Certiorari review is discretionary, and we granted certiorari only on issues presented in the district court on which the parties sought a ruling.

For example, we find no instance in the record where the plaintiffs asserted any constitutional claims to the district court. Plaintiffs had ample opportunity to do so, including the evidentiary hearing before Judge Price, which Price referred to as petitioner's chosen "test case" but which the YLC failed to appeal. More importantly, however, plaintiffs did not raise their constitutional claims to the district court in the two motions filed after the administrative order was issued.

The situation might be different if the. Chief Judge had issued the administrative order and plaintiffs had no prior or subsequent opportunity to be heard before the district court. Even in situations where the petitioner had neither prior notice of the order nor the opportunity to be heard, however, we have indicated "the district court should be offered the first opportunity to correct its mistakes. We thus encourage the filing of motions to rescind [its] orders prior to seeking certiorari review." *See Iowa Dep't of Transp. v. Iowa Dist. Ct. for Lyon County,* 546 N.W.2d 620, 623 (Iowa 1996).

After considering the whole of the record, we have determined the fighting issues in this case, and the only issues properly preserved for review, are: (1) whether the district court applied the wrong disciplinary standard, i.e., improperly disqualifying a former government lawyer where she did not previously have substantial responsibility, and (2) whether, in administrative orders 2003–17 and 2003–18, the Chief Judge abused his discretion in failing to rescind administrative order 2003–14 once Johnson resigned. We have duly considered and rejected all other arguments regarding error preservation.

■■■ Even if the plaintiffs had preserved error on their constitutional claims, we must point out the Chief Judge's actions do not offend their procedural due process rights. Due process is a flexible standard. *State v. Hernandez–Lopez,* 639 N.W.2d 226, 240 (Iowa 2002) (citing, in part, *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18, 33 (1976)). Taking into consideration

(1) the private interest that will be affected by the government action;

(2) the risk of the erroneous deprivation of the interest, and the probable value of additional procedures; and

(3) the government interest in the regulation, including the burdens imposed by additional procedures

the plaintiffs were not deprived of their due process rights. *See. id.* Given the emerging crisis facing the court, the administrative orders were a properly fashioned remedy to an exigency which the plaintiffs created.

## B. Ethical Obligations of the Former Government Lawyer

■■■ The Iowa Code of Professional Responsibility for Lawyers mandates

A lawyer shall not accept private employment in a matter in which the lawyer had substantial responsibility while a public employee.

Iowa Code of Prof'l Responsibility for Lawyers DR 9–101(B) [hereinafter I.C.P.R.]. It also states

If a lawyer is required to decline employment or to withdraw from employment, no partner or associate of the lawyer or the lawyer's firm may accept or continue such employment.

I.C.P.R. DR 5–105(E). At issue in the present dispute is what constitutes "substantial responsibility" for DR 9–101(B). Administrative Order 2003–14 disqualifies the YLC, without further hearings, from representation of children in all cases where

Martha Johnson acted as counsel for the State of Iowa as an assistant Polk County Attorney including but not limited to all cases where Martha Johnson: (a) communicated or provided legal advice to DHS social workers, other prosecutors or agents of the State concerning the subject matter of the case; (b) authored any correspondence or reports concerning the subject matter of the case; (c) signed pleadings filed in the case on behalf of the State; or (d) ap-

peared before the court in proceedings in the case on behalf of the State.

In these four categories of cases, the district court concluded Johnson had "personally and substantially participated in the representation of the State as a former assistant county attorney." *See* Formal Opinion 98–09 (citing DR 9–101(B) and DR 5–105(E)) (lawyer and firm may "not participate in any cases in which he personally and substantially participated . . . other members of . . . legal staff likewise are precluded from such participation).

Although the language used in DR 9–101(B), on the one hand, and Administrative Order 2003–14 and Formal Opinion 98–09, on the other, vary slightly ("substantial responsibility" versus "personally and substantially participated"), as we interpret them, the standards set forth are essentially the same. *See Sec. Investor Prot. Corp. v. Vigman*, 587 F.Supp. 1358, 1367 n. 9 (C.D.Cal.1984). The linguistic discrepancy is due to the influence of the Model Rules of Professional Conduct in the field of professional ethics. *See* Model Rules of Professional Conduct 1.11 (2003) (providing, in relevant part, "a lawyer who has formerly served as a public officer or employee of the government . . . shall not . . . represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee. . . ."). Because Iowa has not yet adopted the Model Rules, however, "substantial responsibility" remains the focus of our analysis today.

Plaintiffs contend the district court abused its discretion in ordering YLC lawyers to be disqualified in these four categories of cases. Plaintiffs claim Johnson's actions as intake attorney were ministerial and cannot constitute substantial responsibility under DR 9–101(B); "the critical inquiry," they allege, is whether a former government attorney has obtained confidential information which she can now use on behalf of a new client. The plaintiffs allege Johnson could not have disclosed any confidential information because of the nature of juvenile proceedings. We reject each of these claims.

We have not previously defined "substantial responsibility" under the I.C.P.R. According to the ABA, however, " 'substantial responsibility' . . . contemplates a responsibility requiring the official to become personally involved to an important, material degree, in the investigative or deliberative processes regarding the transactions or facts in question." ABA Comm. on Ethics and Professional Responsibility, Formal Op. 342 (1975), *reprinted in* 62 A.B.A.J. 517, 520 (1976) [hereinafter ABA Opinion].

■ Upon an examination of the record, we hold the district court did not abuse its discretion in ruling the four categories of cases described by Judge Gamble offend DR 9–101(B). Advising a client, authoring correspondence or reports, signing a pleading, and appearing at a hearing each involve substantial responsibility. *See, e.g., Kadish v. Commodity Futures Trading Comm'n*, 548 F.Supp. 1030, 1033 (N.D.Ill.1982) (drafting complaint requires legal judgment and training, even if boilerplate, and thus involves substantial responsibility); *State v. Dixon*, 438 So.2d 185, 186 (Fla.Dist.Ct.App.1983) (signing indictment constitutes substantial responsibility); *accord* I.C.P.R. EC 3–5 ("the practice of law includes, but is not limited to, representing another before the courts; giving of legal advice and counsel . . .; and preparation or approval of the use of legal instruments. . . . Functionally, the practice of law relates to the rendition of services for others that call for the professional judgment of a lawyer."). In each of the four circumstances, the lawyer becomes "per-

sonally involved to an important, material degree, in the investigative or deliberative processes regarding the transactions or facts in question. . . ." ABA Opinion at 520. Indeed, if an attorney signing even a boilerplate complaint fails to investigate or deliberate upon the legal issues therein, she violates both the mandatory rules and aspirational norms of our' code of ethics. *See, e.g.,* I.C.P.R. DR 7–103 ("public prosecutor or other government lawyer shall not institute or cause to be instituted criminal charges when the lawyer knows or it is obvious that the charges are not supported by probable cause"); DR 6–101(A)(2) ("lawyer shall not . . . [h]andle a legal matter without preparation adequate in the circumstances"); EC 6–4 ("a lawyer's obligation to a client requires adequate preparation for and *appropriate attention to* legal work") (emphasis added); EC 7–25 ("a lawyer . . . should subscribe to or verify only those pleadings believed to be in compliance with applicable law and rules"). *See generally* I.C.P.R. Preliminary Statement (explaining difference between disciplinary rules and ethical considerations; whereas the former are mandatory, the latter are "aspirational in character and represent the objectives toward which every member of the profession should strive"). The district court did not abuse its discretion in ordering the performance of these actions should result in disqualification. All four categories constitute "substantial responsibility" under DR 9–101(B).

Plaintiffs argue "the critical inquiry" of DR 9–101(B) is the protection of confidential information, and since Johnson did not have any confidential information to disclose, the YLC was illegally disqualified. There is evidence Johnson had access to confidential information; Johnson, it appears, was sometimes privy to the identification of the complainant in a CINA action, which is confidential. The problem with plaintiffs' argument, however, lies in the fact it fails to recognize there are *several* policy considerations underlying DR 9–101(B), only one of which is the protection of confidential information. To accept employment in a case for which the lawyer had substantial responsibility while a government lawyer

> would be akin to switching sides, might jeopardize confidential government information, and gives the appearance of professional impropriety in that accepting subsequent employment regarding that same matter creates a suspicion that the lawyer conducted his governmental work in a way to facilitate his own future employment in that matter.

ABA Opinion at 520; *see also* 32 Am. Jur.2d *Federal Courts* § 222, at 505,(1995) ("DR 9–101(B) has been strictly enforced, basically to prevent an attorney from profiting from his former public position" and is not primarily designed to protect confidential government information (citation omitted).

The plaintiffs also contend the mere appearance of impropriety is insufficient to warrant disqualification in these cases. Administrative Orders 2003–17 and 2003–18 note a strong appearance of impropriety in Johnson's actions. After conducting an evidentiary hearing in a contested termination case involving Johnson, Judge Price also correctly ruled "the appearance of impropriety is real and in this matter extensive." Judge Price asked, as do we:

> How must this appear to a reasonable layperson? Can these parents or any citizen feel secure in the fairness of a process that allows a lawyer to try to remove the child from the parents by State action and once removed now represents the interests of the child?

(Citation omitted.) Clearly, permitting Johnson or the YLC to represent children in these four categories of cases would

undermine public trust in the legal system. "The possible loss of that respect and confidence is the ultimate sanction." I.C.P.R. Preamble. Although one may kindly characterize this situation as an "appearance of impropriety," in reality these cases are paradigmatic examples of conflicts of interest, plain and simple. Whether Johnson and the YLC can be disqualified solely on account of a strong appearance of impropriety is an issue we need not decide, however. As we have discussed, Johnson is disqualified in any case in which she had "substantial responsibility." *See* I.C.P.R. DR 9–101(B). Pursuant to DR 5–105(E), the YLC is likewise disqualified. Accordingly, we find no error in Administrative Order 2003–14, insofar as it removed Johnson and the YLC from cases in which Johnson had prior substantial responsibility.

█ Although plaintiffs do not appear to challenge it on these grounds, we also agree with the second mandate of Administrative Order 2003–14, which requires the YLC to disclose other cases in which a conflict of interest may arise for a case-by-case determination. We have recently held, in another conflict-of-interest case, an attorney generally "must be disqualified from representing a party against a former client if the two representations bear a 'substantial relationship' to each other." *Doe,* 650 N.W.2d at 597 (citing *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Walters,* 603 N.W.2d 772, 777 (Iowa 1999)). This prohibition in based in Canon 4, but also implicates Canon 9, insofar as both canons seek to preserve public confidence in the legal system. *See Brennan's, Inc. v. Brennan's Rests., Inc.,* 590 F.2d 168, 171–72 (5th Cir.1979). The district court's order rightly applies the *Doe* factors to ascertain other cases in which conflicts of interest may be present. Of course, in the four categories of cases in which Johnson was deemed to have had

"substantial responsibility" while she was an assistant county attorney, the court need not have applied the *Doe* test because DR 9–101(B) already disqualified Johnson and the YLC.

In disqualifying Johnson and the YLC, we do not dispute, as counsel for the plaintiffs stated at oral argument, that "Martha Johnson is not a bad person." The Iowa Code of Professional Responsibility for Lawyers, however,

> is not designed for Holmes' proverbial 'bad man' who wants to know just how many corners he may cut, how close to the line he may play, without running into trouble with the law. Rather, it is drawn for the 'good man,' as a beacon to assist him in navigating an ethical course through the sometimes murky waters of professional conduct.

*Gen. Motors,* 501 F.2d at 649 (referencing Oliver Wendell Holmes, The Path of the Law, *in* Collected Legal Papers 167, 170 (1920)). In the present case, the I.C.P.R. clearly demanded Johnson and the YLC steer clear of accepting or continuing employment in the four categories of cases identified in Administrative Order 2003–14, so as not to run afoul of professional standards.

█ Lastly, we should note it does not matter that DHS wrote a letter in which it "waive[d] any conflict or appearance of a conflict that may arise from Ms. Johnson's change in employment." This conflict may not be waived. "The Iowa Code of Professional Responsibility for Lawyers has no provision for a . . . 'waiver of objection.' " Formal Opinion 98–09.

## C. Imputed Disqualification After Termination of Employment

█ The Iowa Code of Professional Responsibility for Lawyers is silent on the issue of whether a firm, which was re-

quired to decline or withdraw from employment because of one of its members, must remain disqualified once the personally prohibited lawyer leaves the firm. The I.C.P.R. merely states:

> If a lawyer is required to decline employment or to withdraw from employment, *no partner or associate of the lawyer or the lawyer's firm* may accept or continue such employment.

I.C.P.R. DR 5–105(E) (emphasis added); *accord* Restatement § 124 reporter's note to cmt. *b* ("The ABA Model Code of Professional Responsibility (1969) did not deal with removing imputed prohibitions."). *See generally* Gregory C. Sisk, *Iowa's Ethics Rules——It's Time to Join the Crowd*, 47 Drake L.Rev. 279, 286–87 (1999) (recognizing that, unlike Model Rules of Professional Conduct, I.C.P.R. "fails to directly address" successive conflicts issues).

Plaintiffs urge us to accept the approach of the Restatement, which states, in part,

> Imputation ... does not restrict an affiliated lawyer when the affiliation between the affiliated lawyer and the personally prohibited lawyer that required the imputation has been terminated, and no material confidential information of the client, relevant to the matter, has

been communicated by the personally prohibited lawyer to the affiliated lawyer or that lawyer's firm.

Restatement § 124(1). The Restatement advocates the position that once a lawyer with a conflict of interest leaves her new firm, there ought no longer be "an irrebuttable presumption of continued sharing of client confidences or continued disloyalty." Restatement § 124 cmt. (*c*)(*i*). Instead, the lawyers in the firm

> have the burden of persuasion concerning three facts: (1) that no material confidential client information relevant to the matter was revealed to any lawyer remaining in the firm; (2) that the firm does not now possess or have access to sources of client confidential information, particularly client documents or files; and (3) that the personally prohibited lawyer will not share fees in the matter so as to have an interest in the representation.

*Id.* In the motion to reconsider, plaintiffs offered to file affidavits. The plaintiffs also pointed out the similarity between the Restatement rule and the Proposed Model Rules of Professional Conduct now before this court.[3] The district court refused to

---

**3.** The Proposed Model Rules of Professional Conduct are based upon, but not identical to, the Model Rules of Professional Conduct as promulgated by the Commission on Evaluation of the Rules of Professional Conduct (the so-called "Ethics 2000" commission). The latter Model Rules state, in relevant part:

> When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless:
> (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and
> (2) any lawyer remaining in the firm has information protected by Rules 1.6

[client confidences] and 1.9(c) [use of information to the disadvantage of the former client] that is material to the matter.

Model Rules of Professional Conduct 1.10(b) (2003) [hereinafter Model Rules].

Although the parties did not address this issue, it should be noted that a comment to Model Rule 1.11 states, in relevant part:

> *Rule 1.10 is not applicable to the conflicts of interest addressed by this rule.* Rather, paragraph (b) sets forth a special imputation rule for former government lawyers that provides for screening and notice.

Model Rule 1.11, cmt. [2] (emphasis added). Although our decision today relies upon Restatement section 124(1) and comment (*c*)(*i*) thereto, to permit a firm to represent a person with interests adverse to a client who was represented by a lawyer who formerly was

accept the affidavits, because it rejected the Restatement rule altogether. Instead, the district court relied upon a rule summarized in *Corpus Juris Secundum*, which states termination of employment does not end imputation. 7A C.J.S. *Attorney & Client* § 164, at 238–39 (1980). The court reasoned, in part, "the taint of conflict of interest remains."

We respectfully disagree. In the present case, we believe the district court ought to have rescinded the imputation once Johnson left the YLC. Although the I.C.P.R., and not the proposed Model Rules or the Restatement, sets forth the present legal framework for determining when an attorney must be disqualified, on this issue the Iowa rule is silent. As previously mentioned, however, Johnson's employment with the YLC implicated several policy concerns: 1) the treachery of switching sides; 2) the risk of placing confidential government information in jeopardy; and 3) the appearance of professional impropriety. Only the risk of dissemination of confidential government information remains. Johnson is no long-er a member of any "side"; moreover, given her resignation, the appearance of impropriety is negligible. Johnson resigned from the YLC five months ago, on June 4, 2003; Johnson worked for the YLC for about the same period of time. We do not think a reasonable layperson, taking into account Johnson's resignation and the circumstances attending to it, would conclude the YLC's representation has been tainted and is improper.

■ We recognize the problem of confidentiality remains. In order to allay any concern YLC attorneys may have confidential information, the YLC should be permitted to file affidavits to this effect, in accordance with the three factor Restatement test. Although we are cognizant of the time constraints in juvenile cases, we do not believe our decision today will impose an additional heavy burden upon the district court. First, the second mandate of Administrative Order 2003–14 had already committed the district court to make case-by-case determinations regarding

---

associated with the firm, after reading Model Rule 1.11, comment [2], one may take the view that the Model Rules, unlike the Restatement, contain no provision for the removal of imputation once the personally prohibited *former government* lawyer leaves her new firm, because this removal of imputation provision is contained in Model Rule 1.10, not Model Rule 1.11.

There are several reasons, however, interpret the Model Rules differently. First, the italicized phrase may simply be a way to recognize that under the Model Rules screening procedures are only available to former government attorneys. *Compare* Model Rule 1.11 *with* Model Rules 1.9 and 1.10.

Second, Model Rule 1.10(d) states "[t]he disqualification of lawyers associated in a firm with former or current government lawyers is governed by rule 1.11." This passage implies Rule 1.11 governs cases in which the personally prohibited lawyer is *currently* associated with the firm, and hence any limitation therein does not purport to cover cases in which her employment with the firm has terminated. Comment [2] to Model Rule 1.11, then, may only govern imputations regarding *current* associations. Model Rule 1.10(b) would thus permit removal of imputation once *any* personally prohibited lawyer leaves her new firm.

Most importantly, there does not appear to be a good policy ground which justifies treating members of firms, which formerly employed a personally prohibited lawyer, differently depending upon whether or not the lawyer whose employment was terminated was a former government lawyer. As long as the members of the firm do not possess confidential information, they should be permitted to represent clients in such matters.

The relevant section of the Restatement, however, is applicable to former government attorneys. Restatement section 124(1) applies to "imputation specified in § 123...." Section 123 specifies firm-wide imputation resulting from the conflicts of former government lawyers. *See* Restatement §§ 123, 135.

confidentiality. Second, it appears that for the vast majority of cases, our decision today concerning imputation after Johnson's exit is now moot.

Regrettably, the record does not clearly indicate how many cases will be affected by our decision today. The State argues the dispute is now moot for the overwhelming majority of cases to which the administrative orders apply; because of the lapse in time between the issuance of the original administrative order and when this court issued a stay, in only fourteen affected cases had the district court not removed the YLC lawyer and appointed a non-YLC lawyer in his or her stead. The YLC does not now ask the new guardians ad litem be taken off those cases and the original YLC guardian ad litem be reappointed. We agree with the State: our decision to reverse the district court does not apply to those cases in which a non-YLC lawyer has already replaced the YLC attorney. In those cases the issue is moot and not affected by this opinion.

## IV. Conclusion

Plaintiffs raise three distinct issues before this court. Because plaintiffs failed to preserve error on the first category of claims, we do not entertain their arguments. Considering the two remaining issues on which plaintiffs properly preserved error, we affirm Administrative Order 2003–14, in which the district court removed YLC attorneys from four categories of cases in which Martha Johnson had substantial responsibility. We reverse Administrative Orders 2003–17 and 2003–18. The YLC should be permitted to rebut the presumption its lawyers still possess confidential information. To the extent YLC attorneys already have been replaced, our decision does not apply.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.**

All justices concur except LAVORATO, C.J. and WIGGINS, J., who take no part.