[No. B174102. Second Dist., Div. Four. Jan. 7, 2005.]

ILENE GOLDBERG, Plaintiff and Appellant, v.
WARNER/CHAPPELL MUSIC, INC., et al., Defendants and Respondents.

**COUNSEL**

Greenberg Glusker Fields Claman Machtinger & Kinsella, Dale F. Kinsella, Alan R. Kossoff and Ricardo P. Cestero for Plaintiff and Appellant.

Mitchell Silberberg & Knupp, Adam Levin, Patricia Benson, Courtney Smith and Richard B. Sheldon for Defendants and Respondents.

**OPINION**

**CURRY, J.**—Appellant Ilene Goldberg brought suit against respondents, her former employer Warner/Chappell Music, Inc. (Warner) and her former supervisor Edward Pierson, for wrongful termination. Goldberg claimed that she was discriminated against in the terms and conditions of her employment based on her gender, and terminated in retaliation for raising complaints about gender-based discrimination. Goldberg also claimed to have been terminated in retaliation for "blowing the whistle" on illegal conduct allegedly committed by Pierson, including practicing law without a license.

Goldberg moved to disqualify counsel for respondents, Mitchell Silberberg & Knupp LLP (MS&K). The ground for the motion was that six years earlier Goldberg had consulted with J. Eugene Salomon, a former partner with MS&K who had left the firm three years prior to the underlying lawsuit. The consultation involved Goldberg's written contract with Warner. Respondents and MS&K established in opposition to the disqualification motion that the consultation had been brief and informal, and that no one else at MS&K had any knowledge concerning either the consultation or any confidential information imparted to Salomon. The trial court denied the motion to disqualify.

Goldberg contends that it is or should be the law in California, that an attorney's presumed knowledge of a former client's confidences should cause vicarious disqualification not just of the attorney's present firm, but also any firm the attorney passed through after he or she gained possession of confidential information. Respondents contend that we should follow the lead of the ABA Model Rules of Professional Conduct, which permit a firm that employed the conflicted attorney in the past to undertake representation adverse to the attorney's former client, as long as the firm can prove no current member or associate is actually possessed of confidential information concerning the client.

■   We agree with the trial court that an attorney's presumed possession of confidential information concerning a former client should not automatically cause the attorney's former firm to be vicariously disqualified where the evidence establishes that no one other than the departed attorney had any dealings with the client or obtained confidential information, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

It is undisputed that Goldberg worked as in-house counsel for Warner from 1993 until December 2002. After her termination, Goldberg retained an attorney, Peter Marx, to advise her with regard to a potential lawsuit. On January 10 and 17, 2003, Marx sent letters pertaining to settlement discussions to respondents' attorneys, MS&K. The letters stated that Marx "ha[d] serious concerns about the propriety of [MS&K] representing [respondents] in this matter." His concerns "derive[d] from the fact that prior to the termination of her employment with [Warner], Ms. Goldberg had professional relationships with various members of [MS&K] and indeed ha[d] worked closely with them on various matters, and also maintain[ed] friendships with certain members of [MS&K]. As such, those members of [MS&K] are to one degree or another acquainted with the circumstances concerning the termination of Ms. Goldberg's employment, i.e., they are privy to information which certainly created the impression of impropriety, at the very least." Marx also referred to the fact that Goldberg had submitted a screenplay she had

coauthored to MS&K partner David Steinberg. There was no reference to Goldberg being a former client of the firm.

In August 2003, the parties agreed to mediation. In a letter to MS&K, Goldberg's new counsel, Greenberg Glusker Fields Claman Machtinger & Kinsella, stated: "[Goldberg] expressly reserves any and all rights she may have to disqualify your firm. As I indicated to you, I am going to consider providing you with some information which may impact your decision to continue as counsel for [respondents]. In any event, your participation in the mediation will not and shall not be used in any subsequent proceeding to suggest that Ms. Goldberg has waived her rights or otherwise acquiesced to your firm's participation."

In November 2003, the mediation having failed, Goldberg filed her complaint against respondents. The complaint included claims for violation of the whistleblower statute, discrimination based on gender, retaliatory termination, wrongful termination in violation of public policy, intentional infliction of emotional distress, and violation of salary provisions of the Labor Code. There was no contract claim asserted.

MS&K filed an answer to the complaint on behalf of respondents in December 2003.

*Motion to Disqualify*

Goldberg formally moved to disqualify MS&K on December 10, 2003. In her moving papers, she presented evidence that in 1997, while still employed at Warner, she was given a written employment agreement to sign. She asked Salomon, then a partner with MS&K, to advise her with respect to the agreement. She met with Salomon for an hour and a half on May 9, 1997, to go over the terms of the agreement. She purportedly "disclosed confidential information to him including the nature and term of [her] employment agreement, [her] compensation and benefits, disability, termination by [Warner], [her] ability to retain, disclose, and use confidential/privileged information concerning [her] employment relationship with [Warner], scripts and other literary works created by [her], the effect of a change in control of [Warner], expiration of the employment agreement, and [Warner's] obligations under state and federal law." She also had "other conversations and correspondence with [Salomon] relating to his advice about the terms and conditions of [her] employment agreement." On July 29, 1997, she sent him a letter and draft of a proposed employment agreement, and promised to send

the final agreement "for [his] files." She asked him to send her a bill for his advice, but he refused to do so.[1]

Subsequently, Goldberg retained MS&K to work on various matters for Warner, and she "did not have an objection to [MS&K's] representation of [Warner] in matters that did not conflict with [MS&K's] prior representation of [her]."

### Opposition

Respondents presented evidence in their opposition that in April 1997, one month prior to Goldberg's purported consultation with Salomon, MS&K began legal work on a copyright matter for Warner. A formal retention letter between MS&K and Warner was signed on May 2, 1997.

The executive director of MS&K stated in a declaration that there was no record in any of MS&K's files of Goldberg ever having been a client of the firm, and that the policy of the firm was to execute a formal, written engagement letter before taking on legal representation.

Adam Levin, the MS&K attorney who was responsible for the Goldberg litigation, stated he had been involved with the matter since January 2003, and that at no time prior to the mediation "did any of Goldberg's lawyers assert that MS&K and, in particular, [Salomon], had represented Goldberg in her individual capacity" or otherwise mention Salomon's name. Discussions of the propriety of MS&K's representation of respondents centered on the possibility that Goldberg's personal and professional relationships with other attorneys at the firm created a conflict. In a letter to Marx dated January 21, 2003, Levin stated: "[Y]ou raise purported 'concerns' about this firm's representation of [Warner] adverse to Ms. Goldberg. As we previously discussed, your concerns are wholly unfounded in that this firm has never represented Ms. Goldberg personally. Our past dealings with Ms. Goldberg solely have been in connection with our representation of [Warner] (for whom she sometimes was our client contact), as well as other clients . . . . Accordingly, there is no restriction (ethical, legal or otherwise) on our representation of [Warner] adverse to Ms. Goldberg." On October 30, 2003, at the mediation, Levin "learned for the first time that Goldberg was contending that she had been provided personal legal advice by . . . Salomon."

Salomon stated in a declaration that he practiced law at MS&K from October 1987 through October 2000, when he moved to another firm. He

---

[1] Goldberg's declaration also contained discussion of her professional and personal relationships with other attorneys who worked at MS&K, but none of these relationships are relevant to the current appeal.

denied that he had been retained by Goldberg to represent her in her contract negotiations with Warner. Instead, Goldberg "told [Salomon] she was going to represent herself in negotiations over the contract, but asked if [Salomon] would talk to her about these agreements generally to get a sense of how [Warner] lawyers dealt with the contract's various provisions." He told Goldberg he "would be glad to talk to her about what she could expect in the course of her negotiations." They primarily discussed "what she might expect with respect to the boilerplate issues." Salomon "never discussed with any other lawyer at [MS&K] what was said in [his] conversation with Ms. Goldberg."

Prior to the hearing on the motion to disqualify, Goldberg sought to submit handwritten notes made at the meeting with Salomon for "in camera" review. These notes apparently somehow made it into the public court file.

### Trial Court's Ruling

The court denied the motion to disqualify. At the hearing, the court stated that the only potential basis for disqualification was Goldberg's contact with Salomon, not her personal and professional relationships with other MS&K attorneys. The court concluded that there was an attorney-client relationship between Goldberg and Salomon even though Salomon appeared to be helping her "as a friend." The court agreed that if Salomon were still with MS&K, the firm would be disqualified. However, because Salomon had left the firm, there was no need for vicarious disqualification.

In its order, the court specifically found: "The evidence is undisputed that [MS&K] and Salomon never opened a file for Ms. Goldberg. They never billed her. There are no notes or records in their files about the meeting and no documents were prepared. No telephone calls were made. It was simply a meeting late one afternoon where Ms. Goldberg and Mr. Salomon sat down and discussed the meaning of the employment contract she was being offered and what provisions she might request. [¶] . . . [¶] . . . There is no evidence that Mr. Salomon talked to anyone about this matter when he was with [MS&K]. And more importantly, he had left the firm approximately three years before this matter began. There is no fear of him talking about the case in the lunch room, or having his files seen by other members of the firm, as he is no longer there."

Goldberg filed a petition for writ of mandate for review of the order. By order dated March 24, 2004, the petition was denied, with one dissent. Goldberg noticed an appeal.

## DISCUSSION

■ Rule 3-310(E) of the Rules of Professional Conduct provides that an attorney "shall not, without the informed written consent of the client or former client, accept employment adverse to the client, or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." There is no question that an attorney can and should be disqualified for representing a party adverse to a former client where the attorney possesses confidential information that could be helpful to the new client and hurtful to the old. (See, e.g., *Henriksen v. Great American Savings & Loan* (1992) 11 Cal.App.4th 109, 113 [14 Cal.Rptr.2d 184] ["[A] former client may seek to disqualify a former attorney from representing an adverse party by showing that the former attorney possesses confidential information adverse to the former client"].)

■ The courts do not generally inquire into whether the attorney actually possesses confidential information. (*Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1331 [104 Cal.Rptr.2d 116].) Instead, the substantial relationship test is applied. " '*When a substantial relationship has been shown to exist between the former representation and the current representation*, and when it appears by virtue of the nature of the former representation or the relationship of the attorney to his former client confidential information material to the current dispute would normally have been imparted to the attorney or to subordinates for whose legal work he was responsible, *the attorney's knowledge of confidential information is presumed.*' " (*Rosenfeld Construction Co. v. Superior Court* (1991) 235 Cal.App.3d 566, 574 [286 Cal.Rptr. 609], italics added; accord, *City National Bank v. Adams* (2002) 96 Cal.App.4th 315, 327 [117 Cal.Rptr.2d 125]; *Adams v. Aerojet-General Corp.*, *supra*, 86 Cal.App.4th at p. 1331.)

■ In addition, "[i]t is now firmly established that where the attorney is disqualified from representation due to an ethical conflict, the disqualification extends to the entire firm." (*Adams v. Aerojet-General Corp.*, *supra*, 86 Cal.App.4th at p. 1333.) "[W]here an attorney is disqualified because he formerly represented and therefore possesses [either actually or presumptively] confidential information regarding the adverse party in the current litigation, vicarious disqualification of the entire firm is compelled as a matter of law." (*Henriksen v. Great American Savings & Loan*, *supra*, 11 Cal.App.4th at p. 117; accord, *Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283 [36 Cal.Rptr.2d 537, 885 P.2d 950] ["Where the requisite substantial relationship between the subjects of the prior and the current representations can be demonstrated, access to confidential information by the attorney in the course

of the first representation (relevant, by definition, to the second representation) is *presumed* and disqualification of the attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm"].)

■ There is, however, a recognized "limited exception to this conclusive presumption in the rare instance where the lawyer can show that there was no *opportunity* for confidential information to be divulged." (*City National Bank v. Adams, supra,* 96 Cal.App.4th at pp. 327–328; accord, *American Airlines, Inc v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1038 [117 Cal.Rptr.2d 685].) "[T]o apply the remedy of disqualification 'when there is no realistic chance that confidences were disclosed would go far beyond the purpose' of the substantial relationship test." (*H. F. Ahmanson & Co. v. Salomon Brothers, Inc.* (1991) 229 Cal.App.3d 1445, 1455 [280 Cal.Rptr. 614].)

This limited exception was applied in *Adams v. Aerojet-General Corp., supra,* 86 Cal.App.4th 1324. The supposedly tainted attorney there had worked for the Holliman firm. While he was with the firm, it represented Aerojet with respect to advice on land use issues. The attorney in question, however, had nothing to do with that representation. He departed the firm in 1989. A decade later, his new firm, Hackard Holt, was retained to represent a number of individuals in a suit against Aerojet involving release of toxic chemicals and contamination of groundwater. Aerojet sought to disqualify the attorney and the Hackard Holt firm because of the attorney's former association with the Holliman firm. Declarations submitted to the trial court established that the attorney "did not perform any work on Aerojet matters" and "had no discussions with the [other] attorneys at [the Holliman firm] regarding Aerojet matters and was not made privy to any information, confidential or otherwise, about Aerojet." (*Id.* at p. 1329.) The trial court ordered Hackard Holt disqualified.

On appeal, the court acknowledged that "[i]f [the attorney] himself had been personally involved with the [Holliman] firm's work on Aerojet matters during his tenure with the firm in the 1980's, this appeal would be easily resolved. [The Holliman firm's] former representation of Aerojet clearly has a substantial relationship to the present lawsuit under the [*H. F.*] *Ahmanson* [*& Co. v. Salomon Brothers, Inc., supra,* 229 Cal.App.3d. 1445, substantial relationship] test: factual issues are similar if not identical (disposal of waste and chemical contamination in and around the Aerojet site); legal issues are related (toxic tort liability and the duty to warn the public); and [the attorney's hypothetical] prior work on the case would have placed him in a position to be exposed to confidential information belonging to Aerojet." (*Adams v. Aerojet-General Corp., supra,* 86 Cal.App.4th at p. 1332.)

Because, however, "there [was] no indication of [the attorney's] personal involvement in *Aerojet* matters, nor any direct evidence that he was exposed to client secrets during the time his former firm rendered services to Aerojet," the court decided not to extend the doctrine of imputed knowledge and vicarious disqualification to the new firm. (*Adams v. Aerojet-General Corp.*, *supra*, 86 Cal.App.4th at pp. 1332–1333.) The court believed the "case d[id] not present a standard application of the imputed knowledge doctrine" and that "the [trial] court applied the concept in reverse: instead of imputation from attorney to the remainder of the firm, the court here ruled that, once a connection was shown between the *former firm's* representation and the issues involved in the current lawsuit, the knowledge acquired by the former firm was 'imputed' back to the attorney, mandating his automatic disqualification even after his departure from the firm, without inquiry as to whether the attorney was reasonably likely to have obtained confidential information. [¶] To burden an attorney with . . . presumptive knowledge based solely on his former membership in a law firm which represented the former client, . . . would require a significant extension of the doctrine of imputed knowledge beyond that recognized by any existing case law." (*Id.* at pp. 1333–1334.)

The court explained why it distinguished the situation before it from the situation where the attorney who sought to undertake adverse representation was still working with the attorneys who had acquired the former client's confidential information: " 'No amount of assurances or screening procedures, no "cone of silence," could ever convince the opposing party that the confidences would not be used to its disadvantage. . . . No one could have confidence in the integrity of a legal process in which this is permitted to occur without the parties' consent.' [Citation.] . . . [¶] Once an attorney departs the firm, however, a blanket rule to prevent future breaches of confidentiality is not necessary because the departed attorney no longer has presumptive access to the secrets possessed by the former firm. The court need no longer rely on the fiction of imputed knowledge to safeguard client confidentiality. Instead, the court may undertake a dispassionate assessment of whether and to what extent the attorney, during his tenure with the former firm, was reasonably likely to have obtained confidential information material to the current lawsuit." (*Adams v. Aerojet-General Corp.*, *supra*, 86 Cal.App.4th at pp. 1334–1335.)

The court found further support for its decision in the realities of modern law firm practice: "Disqualification based on a conclusive presumption of imputed knowledge derived from a lawyer's past association with a law firm is out of touch with the present day practice of law. Gone are the days when attorneys (like star athletes) typically stay with one organization throughout their entire careers. . . . We have seen the dawn of the era of the 'mega-firm.' Large law firms (like banks) are becoming ever larger, opening branch offices nationwide or internationally, and merging with other large firms. Individual

attorneys today can work for a law firm and not even know, let alone have contact with, members of the same firm working in a different department of the same firm across the hall or a different branch across the globe." (*Adams v. Aerojet-General Corp., supra,* 86 Cal.App.4th at p. 1336.)

From this, the court concluded that "a rule which disqualifies an attorney based on imputed knowledge derived solely from his membership in the former firm and without inquiry into his actual exposure to the former client's secrets sweeps with too broad a brush, is inconsistent with the language and core purpose of rule 3-310(E), and unnecessarily restricts both the client's right to chosen counsel and the attorney's freedom of association. It also clashes with the principle that applying the remedy of disqualification ' "when there is no realistic chance that confidences were disclosed [to counsel] would go far beyond the purpose" of the substantial relationship test.' " (*Adams v. Aerojet-General Corp., supra,* 86 Cal.App.4th at p. 1337, quoting *H. F. Ahmanson & Co. v. Salomon Brothers, Inc., supra,* 229 Cal.App.3d at p. 1455.)

We agree with the court in *Adams v. Aerojet-General Corp., supra,* 86 Cal.App.4th 1324, that at some point, it ceases to make sense to apply a presumption of imputed knowledge as a lawyer moves from firm to firm. Salomon, while at MS&K, gave advice to Goldberg concerning the terms of her contract with Warner. We agree with the trial court that, despite the informality, an attorney-client relationship existed between them. Moreover, if Salomon were still practicing at MS&K, MS&K would likely have to be disqualified from the current litigation because there would be no practical way of ensuring that, despite his best intentions, Salomon would not let slip some confidential information he may not even be aware that he possesses. But Salomon is no longer with MS&K. We need not be concerned that he will inadvertently pass on confidential information to his colleagues in the future because he is no longer there "in the lunch room" as the trial court said. It was appropriate under the circumstances for the trial court to make an assessment of whether Salomon actually passed on confidential information. Since the court found he had not, there was no basis for disqualification.

Goldberg cites *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135 [86 Cal.Rptr.2d 816, 980 P.2d 371] (*SpeeDee Oil*) and *Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.* (N.D.Cal. 1992) 809 F.Supp. 1383 (*Elan*) for the proposition that there is an irrebuttable presumption that Salomon's knowledge of confidential information was passed on to MS&K attorneys. In *SpeeDee Oil,* the court expanded the rule of vicarious disqualification to include attorneys acting "of counsel" to a law firm. In that case, a number of SpeeDee Oil franchises brought suit against the franchisee, Mobil. The Shapiro firm was associated in as counsel

for one of the franchisees. At around the same time the Shapiro firm became involved, Mobil consulted with Attorney Eliot Disner, who was of counsel to the firm. Neither Mobil nor Disner was aware of the firm's representation of the franchisee at the time of the consultation. Thereafter, Mobil objected to the Shapiro firm's continued involvement in the case because Mobil believed it had imparted confidential information about the litigation to Disner.

Disner was of counsel to the firm at the time of the disqualification motion and had no plans to leave his position, so the primary issue was whether the relationship between the tainted attorney and the firm was sufficiently close to justify disqualification of the entire firm. The record showed "without contradiction that Disner received material confidential information concerning [the] claims against Mobil." (*SpeeDee Oil, supra*, 20 Cal.4th at p. 1152.) Although Disner sought to assure the court that "he did not discuss 'the merits' of the case with attorneys or employees of the Shapiro firm," there were no "effective screening procedures" set up by the firm to secure confidences from disclosure, and "[t]he potential for a breach of the duty of confidentiality, whether inadvertent or otherwise" was apparent. (*Ibid.*) The court concluded that "[t]he close, personal, continuous, and regular relationship between a law firm and the attorneys affiliated with it as of counsel contains many of the same elements that justify the rule of vicarious disqualification applied to partners, associates, and members." (*Id.* at p. 1154.) The court's focus on the continuing relationship between the attorney and the firm, and the danger of inadvertent disclosure as long as that relationship lasted, distinguishes that case from the present situation and renders its holding of little assistance here.

In *Elan*, the motion to disqualify arose in a patent dispute between two corporations, Elan and Cygnus. Elan sought to replace its original counsel with the Irell firm. However, Irell had in the past been merged with a Menlo Park firm that was doing patent work for Cygnus. A few years earlier, the two firms "de-merged" and almost all of the Menlo Park personnel, including the partner handling the Cygnus work, became affiliated with another firm. Irell sought to show that the de-merger removed the taint, but Cygnus was able to show that four or five attorneys still with the firm had worked on Cygnus matters, and two—Cost and Rothman—had worked briefly on a matter seemingly directly related to the Elan dispute. The court concluded that "[w]hile there is a reasonable probability that confidences were disclosed to Cost and Rothman, the presumption of a substantial relationship is rebutted by declarations by Cost and Rothman that they received no confidential information regarding Cygnus' patent . . . ." (*Elan, supra*, 809 F.Supp. at p. 1389.) The court went on to rule, however, that because of the "substantial relationship between the work that Irell did, through its former attorneys, for

Cygnus, and its current representation of Elan," the firm should be disqualified based on a "conclusive presumption" of shared confidences. (*Id.* at p. 1389, 1390.)

The district court in *Elan* cited *Rosenfeld Construction Co. v. Superior Court, supra,* 235 Cal.App.3d 566, 577, for its belief that California law applies a "conclusive presumption" to the notion that shared confidences have passed between a firm and its former attorneys. In fact, *Rosenfeld* involved the more commonplace disqualification issue that arises when tainted and nontainted attorneys work together in the same firm at the same time. An attorney representing individual plaintiffs in a litigation against the Rosenfeld construction company, left his firm and joined the Wild firm, which had done work for Rosenfeld in the past. The Court of Appeal sent the matter back for a determination of whether there was a substantial relationship between the older matters and the current litigation. It held that if a substantial relationship was found to exist, it would "creat[e] the conclusive presumption that the Wild firm possesses confidential information of its former client, [Rosenfeld]" and require disqualification. (*Id.* at p. 577.)

Although the facts in *Elan* are closer to our situation than those in *SpeeDee Oil* or *Rosenfeld,* there are significant distinctions. The consultation between Goldberg and Salomon was informal and brief, and apparently took place a few days *after* Warner officially became a client of MS&K. (See *In re Marriage of Zimmerman* (1993) 16 Cal.App.4th 556, 564–565 [20 Cal.Rptr.2d 132] [where wife involved in marital property dispute inadvertently called the partner of the attorney representing her husband and spoke with him for 20 minutes about her side of the case, court held that the "preliminary and peripheral" nature of the consultation did not give rise to presumption that the partner acquired confidential information related to the proceedings].) In the *Elan* case, the representation of the former client Cygnus was extensive and broad-ranging, involving the work of 29 different Irell partners and employees, several of whom were still with the Irell firm. Other current Irell lawyers, although they billed no time themselves, were mentioned in timesheets as having discussed Cygnus-related matters with the billing attorneys. There was no need for the court to rely on an irrebuttable presumption of knowledge imputed from *former* attorneys, when attorneys presumed to hold confidential information were still working at Irell. In addition, there was prior notice to both the firm and client of the risk of disqualification. Before the de-merger, the Irell ethics committee had determined that the firm could not accept representation of Elan in similar litigation because of the firm's relationship with Cygnus. Here by contrast, Goldberg's attorneys coyly alluded to "information which may impact [MS&K's] decision to continue," but neither MS&K nor Warner was aware of the true basis for the threatened effort to disqualify until the mediation—

months after MS&K assumed representation and the clients had presumably incurred substantial attorney fees.

More importantly, we believe the district court misconstrued California law. If an attorney worked on a matter "substantially related" to the matter in which he or she seeks to represent a party adverse to a former client, the presumption is conclusive that the *attorney* is possessed of confidential information that would impact the present matter. Where tainted attorneys and nontainted attorneys are working together at the same firm, there is not so much a conclusive presumption that confidential information has passed as a pragmatic recognition that the confidential information will work its way to the nontainted attorneys at some point. When, however, the relationship between the tainted attorneys and nontainted attorneys is in the past, there is no need to "rely on the fiction of imputed knowledge to safeguard client confidentiality" and opportunity exists for a "dispassionate assessment" of whether confidential information was actually exchanged. (*Adams v. Aerojet-General Corp.*, *supra*, 86 Cal.App.4th at p. 1335.) This is precisely what the trial court did here.

Our conclusion that the trial court analyzed the matter correctly is also in line with the ABA Model Rules of Professional Conduct, which California courts may consult when a matter is not addressed by the California Rules. (See, e.g., *Flatt v. Superior Court*, *supra*, 9 Cal.4th at pp. 282–283; *Ojeda v. Sharp Cabrillo Hospital* (1992) 8 Cal.App.4th 1, 8 [10 Cal.Rptr.2d 230].) Model Rule 1.10(b) provides: "When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless (1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and (2) any lawyer remaining in the firm has [protected] information . . . that is material to the matter." Courts from other jurisdictions have followed the ABA Model Rule in situations analogous to the present one: where an attorney who presumptively acquired confidential information from a former client leaves the firm, the firm is not automatically disqualified if it chooses to represent a party adverse to the former client. (*Sorci v. Iowa District Court for Polk County* (Iowa 2003) 671 N.W.2d 482, 494–495 [noting that "Iowa Code of Professional Responsibility for Lawyers is silent on the issue of whether a firm, which was required to decline or withdraw from employment because of one of its members, must remain disqualified once the personally prohibited lawyer leaves the firm," court applied the ABA Model Rules and the Restatement

to resolve disqualification issues]; *Richard v. Southern Pacific Transp. Co.* (E.D.La. 1990) 735 F.Supp. 206, 209 [court applied ABA Model Rule 1.10(b) where former client's relationship to presumptively tainted attorney and his former firm was "temporary in nature and on a trial basis," and denied disqualification motion].) This is further basis to uphold the trial court's determination.

## DISPOSITION

The order is affirmed.

Hastings, Acting P. J., and Grimes, J.,[*] concurred.

---

[*]Judge of the Los Angeles Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.